# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 4, 2010 Session

## STATE OF TENNESSEE v. JOEL RICHARD SCHMEIDERER

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Maury County**
**No. 14488     Jim T. Hamilton, Judge**

---

**No. M2007-01922-SC-DDT-DD - Filed September 14, 2010**

---

In this capital case, the defendant, Joel Richard Schmeiderer, was convicted of first degree premeditated murder in connection with the strangling death of a fellow inmate. The jury imposed a sentence of death for the murder based on two aggravating circumstances. The Court of Criminal Appeals affirmed. On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1), we designated the following issues for oral argument:[1] 1) whether the trial court abused its discretion by denying the defendant's motion for a second continuance; 2) whether this denial of a continuance violated the defendant's constitutional right to present mitigation evidence during the sentencing phase; 3) whether the trial court erred by allowing the State to introduce into evidence and argue a non-statutory aggravating circumstance during the sentencing phase; 4) whether the prosecutor's closing argument during the sentencing phase constituted plain error mandating reversal; and 5) whether the sentence of death is disproportionate or invalid under the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed the record and relevant legal authority, we conclude that none of the errors alleged by the defendant warrant relief. With respect to issues not herein specifically addressed, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

JANICE M. HOLDER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, WILLIAM C. KOCH, and SHARON G. LEE, JJ. joined.

Claudia S. Jack, District Public Defender; Shipp Weems and Michelle VanDeRee, Assistant Public Defenders, Columbia, Tennessee, for the appellant, Joel Richard Schmeiderer.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Joel Douglas Dicus and Patrick Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

At the guilt phase of the trial, the State presented proof that on the evening of July 11, 2001, the victim, Tom Harris, an inmate at the South Central Correctional Center in Clifton, Tennessee, was strangled to death in his cell. The victim's cell was located on the second floor of a "pod." The cells belonging to the defendant, Joel Richard Schmeiderer, and co-defendant, Charles Sanderson, were on the first floor in that pod. Inmates were permited access to cells within their pod.

The victim was last seen alive in his cell at approximately 7:00 p.m. when Jeremy Means, a correctional officer, delivered an educational pass for the victim's cellmate, Robert Craig. Shortly after 8:00 p.m., inmates returned to their pod for a head count after a period of recreation. Officer Means could not see the victim's cell from his post at the entry to the pod. Daniel Pollen, who was housed next to the victim's cell, testified that he heard loud "thumping" noises coming from the victim's cell at approximately 8:10 p.m. Another inmate, Douglas Ford, testified that he saw the defendant and Mr. Sanderson quickly leave the victim's cell at approximately 8:20 or 8:25 p.m. A few minutes later, Mr. Craig went to the victim's cell. Because Mr. Craig had been housed in the victim's cell for only one night, he did not yet have a key. The victim and Mr. Craig had been using a piece of cardboard to prevent the cell door from locking, but the cardboard was not in the door. The victim did not answer when Mr. Craig pounded on the locked door.

Officer Means responded to Mr. Craig's call for help at 8:30 p.m. Officer Means unlocked the cell and found the victim face down on the floor with a sock around his neck. The cell was in disarray. There was blood on the sock, the victim's shirt, the television, the outside door handle, and a towel in the sink. The defendant's cell was located at the bottom of a stairway, and a blood trail led from the victim's cell to the top of the stairway.

2

The defendant's cellmate, Jeffrey Hubert, testified the defendant met in their cell with Mr. Sanderson on the day of the murder. The men stopped talking each time Mr. Hubert entered the cell. When the guards locked down the prison at 8:45 p.m., Mr. Hubert returned to the cell. The defendant told him that "it was going to be a long night." The defendant also indicated that the guards would find blood on his pants because he had injured himself on the basketball court that day. Mr. Hubert saw the defendant remove a shirt from a plastic bag and use his teeth to tear off a part of the shirt containing a blood stain. The defendant flushed the bloody material down the toilet. The blood-stained pants and blood-stained torn shirt were found in subsequent searches of the defendant's cell.

Mr. Hubert asked the defendant whether "he had stuck the old man upstairs." The defendant replied, "The man hadn't been stuck. He'd been strangled to death." The defendant told Mr. Hubert that the "old man put up a fight" and "bit Chuck [Mr. Sanderson] on the hand." The defendant also remarked that the victim was a "baby raper" whose sentence was not long enough and that the killing would get the defendant back into court, giving him an opportunity to escape.

Two agents from the Tennessee Bureau of Investigation ("TBI") interviewed the defendant after he waived his *Miranda* rights. When asked to explain what happened, he responded, "Well, you're the investigators, you tell me." The agents then related to him their theory that he and Mr. Sanderson had gone into the victim's cell. A struggle ensued during which Mr. Sanderson's finger was bitten and bled. The defendant punched the victim and ultimately strangled him with a sock. In the process, the defendant's clothes were stained with both the victim's blood and Mr. Sanderson's blood. Essentially confirming this theory, the defendant stated, "That's pretty much it." When asked if he was bothered by taking a man's life, the defendant laughed, shrugged his shoulders, and said, "No."

Dr. Charles Harlan, the pathologist who performed the autopsy of the victim, determined that the cause of death was strangulation. In addition to scrapes and bruises, the victim's body had a line around the neck with broken capillaries, indicating that an object was tied or wrapped around the neck tightly.

Serological testing showed that Mr. Sanderson's blood was on the television in the victim's cell, the outside door handle, and the towel in the sink. The sock used to strangle the victim contained both his and Mr. Sanderson's blood. The defendant's shirt had the victim's blood on it. The defendant's pants contained both the victim's and Mr. Sanderson's blood.

In defense, the defendant presented the testimony given by Mr. Sanderson at his separate trial. In that prior testimony, Mr. Sanderson stated that on the evening of the murder

3

he went to the victim's cell to beat up the victim for disrespecting Mr. Sanderson earlier that day. The defendant stayed outside the victim's cell as a lookout. Mr. Sanderson knocked the victim against the wall and hit him several times in the face after he bit Mr. Sanderson's finger. Mr. Sanderson cleaned his finger at the sink, wiping his hand on the towel. When he left the cell, the victim was alive, sitting on the bunk. Mr. Sanderson and the defendant then went their separate ways. Mr. Sanderson could not explain how his blood got on the defendant's pants or on the sock around the victim's neck.

The jury convicted the defendant of first degree premeditated murder. A sentencing hearing was conducted to determine punishment.

During the sentencing phase, the State presented the testimony of the warden of the South Central Correctional Center, who confirmed that the defendant was an inmate there on the day of the murder. The State also introduced proof that in August 1999 a jury convicted the defendant of first degree premeditated murder and two counts of attempted first degree premeditated murder and that he pleaded guilty to aggravated assault in December 1999.

Through the testimony of the two victims of the defendant's attempted murders and the wife of one of those victims, the facts underlying these convictions and the murder conviction were presented. Their testimony showed that on October 9, 1998, when the defendant was eighteen years old, he argued with two men at a gas station. When the two men left, the defendant and his companions gave chase, shooting at the men's truck. The chase ended when the defendant's car rammed the truck. The two men got out of the truck and ran behind a nearby house. The defendant approached the owner of the house and tried to shoot him, but the gun misfired. When the two men returned to the truck, the defendant fired the gun at them. One of the men was fatally shot and fell against the house. The defendant tried to shoot him again, but the gun misfired.

In mitigation, the defendant presented the testimony of Joseph Cody Uttmor, who was with the defendant when he committed the earlier murder and attempted murders. Mr. Uttmor explained that he and the defendant were high on Xanax at the time.

The defendant also presented the testimony of three family members. His mother testified that she never married the defendant's father, who showed no affection toward the defendant. The defendant started getting into trouble in high school. After he was sent to an alternative school, he began stealing drugs, money, and guns. He entered a juvenile facility at age fifteen and remained there until his eighteenth birthday. The defendant's maternal aunt and twelve-year-old sister testified that they loved the defendant, and they asked the jury not to sentence him to death.

Three witnesses testified about the defendant's more recent conduct at Riverbend Maximum Security Prison. Mickey Sawyers, a case manager at Riverbend, testified that the defendant had remained discipline-free during the prior two years. Ron Mosby and Adam Olsen, ministerial volunteers at Riverbend, testified that the defendant, who was baptized in February 2004, had much to offer in life and could be fruitful even in the prison environment.

Finally, the defendant presented the testimony of Dr. Ann Marie Charvat, a mitigation specialist. She testified regarding her review of the defendant's school, medical, juvenile, and prison records. Although the defendant was evaluated at a psychiatric facility when he entered the juvenile justice system, he never received the recommended treatment for drug addiction. Just a few months after he was released from state custody, he committed his earlier murder and attempted murders. The "theme" of the defendant's life was exclusion – exclusion from his father's family, exclusion from a regular school environment, and exclusion from a normal teenage life. Dr. Charvat believed that the defendant suffered from a cognitive emotional disorder resulting from "extreme psychological abuse."

Based on this proof, the jury found that the State had proven beyond a reasonable doubt both statutory aggravating circumstances: the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence; and the murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement. See Tenn. Code Ann. § 39-13-204(i)(2), (8) (2006 & Supp. 2009). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances. As a result, the jury sentenced the defendant to death for the murder of Tom Harris.

## ANALYSIS

### Denial of Continuance

The defendant asserts that the trial court abused its discretion by denying his motion for a continuance because his attorneys did not have adequate time to review the transcript of Mr. Sanderson's trial and because his experts needed additional time to complete medical testing and evaluations. The defendant further argues that the trial court's ruling violated his right to present a defense under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The State maintains that the trial court properly declined to grant a second continuance.

On July 26, 2001, the defendant was indicted. On August 16, 2001, the State filed a notice of intent to seek the death penalty. On August 9, 2002, the trial court granted the

5

defendant's *ex parte* motion for funds for a mitigation assessment. The case was set for trial on February 3, 2003. On January 9, 2003, the defendant moved for a continuance, stating that, although his medical and school records had been obtained, his records from various correctional institutions had not. The trial court granted the continuance, and the case was reset for trial on May 3, 2004. On March 11, 2004, the trial court granted the defendant's *ex parte* motion for additional funds for his mitigation expert, Dr. Charvat, and funds for a psychiatric expert, Dr. Stephen Montgomery. On April 28, 2004, less than a week before the trial date, the defendant filed a motion for a continuance, citing the need for more time to conduct neurological and neuropsychological evaluations. On the next day, April 29, 2004, the defendant moved for a continuance on the additional ground that he had not received a transcript of Mr. Sanderson's trial.

On May 3, 2004, the trial court held a hearing on the motion for a continuance. Dr. Montgomery testified that he had evaluated the defendant for ninety minutes on April 20, 2004. The only significant finding from that evaluation was that the defendant inappropriately approached his situation in "a somewhat nonchalant and jovial way instead of a serious way." Discussing the defendant's medical history, Dr. Montgomery stated that the defendant "suffered a possible head injury in 1982, when he fell down the stairs breaking his nose." In 1995, the defendant had an "abnormal" electroencephalogram ("EEG"), which "could possibly mean that he has some impairment or dysfunction in his brain." Dr. Montgomery testified that he could not complete his evaluation of the defendant without further neurological and neuropsychological testing, including a repeat EEG and a magnetic resonance imaging ("MRI") study of his brain. On cross-examination, Dr. Montgomery acknowledged that an abnormal EEG did not necessarily indicate brain damage or abnormality.

Dr. Charvat, the defendant's mitigation expert, testified that she had been retained over a year before the hearing. She had interviewed the defendant and his close family but no other witnesses. Although she considered additional interviews to be "necessary," she had only "identified, potentially, what [she was] going to need to substantiate." She stated that her mitigation evaluation could not be completed without a complete psychological evaluation.

On May 4, 2004, the day voir dire began, the trial court entered a written order denying the motion for a second continuance. The trial court observed that the case had been pending for nearly three years. The trial court found it noteworthy that both experts spoke in terms of conjecture and possibilities: that a brain injury "could" exist and that such a condition "could" be used as mitigation. The trial court also found that none of the evidence being developed by the experts was pertinent to the guilt phase of the trial. The trial court therefore found that the experts had adequate time to develop any further mitigation evidence

6

in the two weeks before the sentencing phase would possibly begin. Finally, the trial court found that on May 3, 2004, defense counsel had been provided with Mr. Sanderson's trial testimony and therefore would have adequate time to review it before the guilt phase would begin. The record reflects that defense counsel received the remainder of the transcript two days before the guilt phase began on May 10, 2004.

The record does not reflect whether defense counsel continued to pursue funding for further mental evaluations after the motion for a continuance was denied. Dr. Montgomery had estimated that such evaluations, including an EEG, MRI, neurological examination, and neuropsychological testing, would cost $10,627 and take eight to ten weeks to complete. In the order denying the continuance, the trial court suggested that, if the funding issue with the Administrative Office of the Courts could be resolved expeditiously, defense counsel should locate a different doctor whose schedule was more accommodating.

The granting of a continuance lies within the sound discretion of the trial court. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995). A defendant who asserts that a denial of a continuance constitutes a denial of Sixth Amendment or due process rights must establish actual prejudice. Odom, 137 S.W.3d at 589.

The record does not support the defendant's argument that additional time was needed to review the transcript of Mr. Sanderson's trial. Seven days before the guilt phase began, defense counsel received the portion of the transcript containing Mr. Sanderson's testimony. The defendant introduced that testimony in his defense. Although the remainder of the transcript was not provided to defense counsel until two days before the guilt phase began, the defendant has failed to indicate what portion of the remainder of the transcript was necessary to his defense. We agree with the trial court that defense counsel had adequate time to review the transcript of Mr. Sanderson's trial.

We also agree with the trial court that the defendant had adequate time to complete any necessary mental evaluations in the nearly three years that the case had been pending. As the trial court found, Dr. Montgomery's testimony at the hearing on the motion for a continuance was speculative. The defendant did not call Dr. Montgomery to testify during the guilt or sentencing phase of the trial. The defendant has failed to demonstrate that Dr. Montgomery's testimony would have been favorable to the defense. Dr. Charvat testified for the defense during the sentencing phase. The defendant has failed to show how a continuance would have significantly enhanced her testimony. The circumstances of this case are similar to those in Odom in which a defense expert asserted that his psychiatric

evaluation could not be completed without a neuropsychological evaluation. Id. at 589-90. We upheld the trial court's denial of a continuance. Id. at 590. As in Odom, there is no indication in this case that the defendant was denied a fair trial or that the result of the trial would have been different had a continuance been granted. Accordingly, the defendant is not entitled to relief on this issue.

## Right to Present Mitigation Evidence

The defendant contends that the trial court's denial of a second continuance also violated his constitutional right to present mitigation evidence. The State counters that the trial court did not exclude any mitigation evidence.

Exclusion of relevant mitigating evidence from a sentencing hearing violates the Eighth Amendment to the United States Constitution. Skipper v. South Carolina, 476 U.S. 1, 8 (1986). When a trial court erroneously excludes mitigating evidence in the sentencing phase of a trial, the State bears the burden of proving beyond a reasonable doubt that the sentence would have been the same even if the excluded evidence had been allowed. State v. Rimmer, 250 S.W.3d 12, 24 (Tenn. 2008).

We agree with the State that the defendant's claim does not sound under the Eighth Amendment. The trial court did not exclude any relevant mitigating evidence. The defendant chose not to call Dr. Montgomery to testify at the sentencing hearing. Dr. Montgomery's testimony at the continuance hearing was speculative as to whether the defendant suffers from brain damage. The defendant has failed to show that additional time would have altered Dr. Montgomery's findings such that the defendant would have presented Dr. Montgomery as a witness at the sentencing hearing. Similarly, the defendant has not demonstrated how the denial of a continuance restricted Dr. Charvat's testimony.

The record contains nothing more to substantiate the claim of the defendant that he suffers from brain damage. No further proof was presented on the issue at the hearing on the motion for a new trial, which was held three years after the trial. We conclude that the trial court's denial of a second continuance neither effectively denied Dr. Montgomery the chance to testify nor restricted Dr. Charvat's testimony. Accordingly, we hold that the trial court's ruling did not violate the defendant's constitutional right to present mitigating evidence during the sentencing phase.

8

**Non-Statutory Aggravating Circumstance**

The defendant contends that the trial court erred in admitting into evidence Mr. Sanderson's prior convictions. The defendant argues that this evidence improperly allowed the State to argue as a non-statutory aggravating circumstance that the defendant deserved the death penalty because his criminal record was worse than Mr. Sanderson's. The State asserts that admission of Mr. Sanderson's prior convictions was a mere evidentiary error and, even if the error was of constitutional dimension, it was harmless beyond a reasonable doubt.

During the guilt phase of the defendant's trial, testimony from a TBI agent established that Mr. Sanderson had been convicted of first degree premeditated murder in connection with the victim's death. The trial court allowed the defendant to introduce into evidence the judgment document for Mr. Sanderson's conviction, but the sentence for his conviction was redacted. Prior to the sentencing phase of the defendant's trial, the trial court granted the defendant's motion to be permitted to introduce Mr. Sanderson's sentence of life without the possibility of parole as a mitigating circumstance. In response, the State requested permission to introduce Mr. Sanderson's prior convictions for burglary, larceny, and armed robbery that had been presented as proof of an aggravating circumstance at Mr. Sanderson's trial. The trial court ruled, again before the sentencing phase began, that the State would be allowed to introduce Mr. Sanderson's prior convictions.

The prosecutor's opening statement at the sentencing phase referred to Mr. Sanderson's sentence and prior convictions:

> Now, also ladies and gentlemen, I'm going to tell you that you will hear, during this phase of the trial, at some point, that the co-defendant, Charles Sanderson, that we've heard so much about here, has already been tried and convicted of first degree murder. The jury in his case gave him life without parole. Okay.
>
> But the rest of the story is, is that – Let me tell you a little bit about what that jury had to consider. That Mr. Sanderson had convictions like burglary, and theft, and armed robbery. No murders. No attempted murders. No aggravated assaults.
>
> And I'm going to submit to you, ladies and gentlemen, that you're dealing with two completely different people here, when you look at those people's background, what their [sic] in prison for, and the big picture of what each one of them

deserves.  No, it's true, he got life without parole, but he wasn't convicted of murder already.

The defendant objected to this line of argument.  The defendant also objected during the sentencing phase when the State introduced in its case-in-chief the judgment documents for Mr. Sanderson's prior convictions for burglary, larceny, and armed robbery.  In allowing the State to introduce the documents, the trial court reasoned that the evidence was admissible to rebut the mitigating circumstance of Mr. Sanderson's sentence.  There is no indication in the record, however, that the defendant ever offered Mr. Sanderson's sentence as evidence, although the trial court granted permission to the defendant to do so.  The prosecutor's closing argument did not refer to Mr. Sanderson's sentence and prior convictions.

In determining whether to impose the death penalty, the jury is limited to consideration of the aggravating circumstances listed by statute.  Tenn. Code Ann. § 39-13-204(i).  Evidence relevant to the issue of punishment and therefore admissible at a capital sentencing hearing includes "any evidence tending to establish or rebut any mitigating factors."  Tenn. Code Ann. § 39-13-204(c).  This rebuttal evidence must be relevant to a mitigating factor actually raised by the defendant.  Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979); cf. State v. Nesbit, 978 S.W.3d 872, 890 (Tenn. 1998) (recognizing that Cozzolino does not limit admission of evidence about the nature and circumstances of the crime, including victim impact evidence, even though such proof is not necessarily related to a statutory aggravating circumstance).

In Cozzolino, the trial court permitted the State to introduce proof of subsequent crimes on the theory that it was relevant to rebut evidence of mitigating circumstances that might be advanced by the defendant.  We held that the trial court erred because "[o]ne cannot rebut a proposition that has not been advanced."  584 S.W.2d at 768.  We noted that, while the error admittedly might have been made harmless by the later introduction by the defendant of evidence to which the State's proof of subsequent crimes was relevant in rebuttal, that did not occur.  We therefore reversed the verdict of the jury imposing the death penalty and remanded for a new sentencing hearing.  Id.

As in Cozzolino, we conclude that the trial court erred by allowing the State to introduce rebuttal evidence during its case in chief.  With regard to whether the error is reversible, however, this case is distinguishable from Cozzolino.  In this case, the jury had already heard proof of Mr. Sanderson's prior convictions during the guilt phase when the defendant presented the testimony given by Mr. Sanderson during his separate trial.  In that prior testimony, Mr. Sanderson acknowledged that he previously had been convicted of burglary, larceny, and armed robbery.

10

Moreover, we do not view the trial court's ruling as effectively allowing the State to enter into evidence and argue a non-statutory aggravating circumstance. The prosecutor's opening statement made clear that proof of Mr. Sanderson's prior convictions would be offered as rebuttal evidence. The prosecutor's closing argument made no mention of this proof. The trial court properly instructed the jury regarding the two statutory aggravating circumstances and gave this admonishment: "You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without the possibility of parole would be appropriate punishment in this case." We conclude that the trial court's error and any impropriety during the State's opening statement did not affect the jury's sentencing determination to the defendant's prejudice. See State v. Chalmers, 28 S.W.3d 913, 918 (Tenn. 2000). We further conclude that, even if the error were considered to be of constitutional dimension, it was harmless beyond a reasonable doubt because the jury had already heard proof of Mr. Sanderson's prior convictions during the guilt phase.

**Closing Argument**

The defendant asserts that the prosecutor's closing argument during the sentencing phase constitutes plain error mandating reversal. Specifically, the defendant contends that the prosecutor impermissibly argued for specific deterrence. The State maintains that the prosecutor's comments were proper argument about the relevant aggravating circumstances and that, even if improper, the comments did not affect the jury's sentencing decision.

During closing argument, the prosecutor made the following comments:

> If you find anybody's at fault, make no mistake about it, [the defendant] brought us all here. He brought us to this place in time. He brought himself to this place in time. They're not really asking you for justice. They're asking you for mercy. He didn't show his victims any mercy. They don't want justice. Because if you do justice, ladies and gentlemen, do justice under the law and give only one punishment for a man that kills, and kills again, and keeps killing.

> There is only one punishment left for somebody that you've tried to punish, you've tried to reform, and he keeps on killing. There's only one left. And I am sorry his life has called on all of us to extract [t]his punishment, but make no mistake about it, [the defendant] brings us here. Give him not what he wants now, but what he does.

Generally, prosecutors should avoid arguing specific deterrence during the sentencing phase of a capital case because the argument is not relevant to any statutory aggravating circumstances. State v. Sims, 45 S.W.3d 1, 15-16 (Tenn. 2001). In this case, the defendant has waived the issue because he did not contemporaneously object to the prosecutor's comments at trial. See id. at 16.

Moreover, our review of the record convinces us that the prosecutor's comments were not improper under the circumstances of this case. See State v. Bates, 804 S.W.2d 868, 882 (Tenn. 1991) (holding that the State's future dangerousness argument in direct response to the defendant's mitigating theory, including amenability to treatment and rehabilitation, was not improper under the circumstances of the case). In this case, the defendant presented mitigating evidence that he had remained discipline-free during the two years prior to the sentencing hearing, thus implying that he was amenable to rehabilitation. Therefore, as in Bates, the State's future dangerousness argument was relevant to the defendant's mitigation theory regarding amenability to rehabilitation. In addition, the future dangerousness argument in this case was relevant to the State's theory regarding the weight to be given to the aggravating circumstances supported by evidence that the defendant had committed murders both outside and inside prison. See id. (observing that the future dangerousness argument may be relevant to an aggravating circumstance).

Even if the argument was improper, any error was harmless because the prosecutor's comments did not affect the jury's sentencing decision. See State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988) ("If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment."). In making this determination, we have considered the following: 1) the conduct complained of in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case. Chalmers, 28 S.W.3d at 917. The defendant did not object to the prosecutor's argument and did not ask for a curative instruction. Although the comments about which the defendant complains were an attempt to improperly sway the jury, they were not so exceptionally flagrant as to require reversal. See State v. Banks, 271 S.W.3d 90, 132 (Tenn. 2008). The cumulative effect of any improper argument and any other errors in the record was far outweighed by the strength of the evidence supporting the jury's finding that the aggravating circumstances outweighed proof of any mitigating circumstances beyond a reasonable doubt. Accordingly, we hold that the prosecutor's closing argument during the sentencing phase does not constitute plain error.

**Mandatory Review**

We are bound by statute to review the application of the death penalty to determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (2006). Our review of the record confirms that the death sentence in this case was not imposed in an arbitrary fashion.

We also conclude that the evidence supports the jury's findings with respect to the two aggravating circumstances beyond a reasonable doubt. The evidence that the defendant had prior convictions for first degree premeditated murder, aggravated assault, and two counts of attempted first degree premeditated murder supports the jury's finding of aggravating circumstance (i)(2), that the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence. See Tenn. Code Ann. § 39-13-204(i)(2). The evidence that the defendant was an inmate at South Central Correctional Center when he committed the murder supports the jury's finding of aggravating circumstance (i)(8), that the murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement. See Tenn. Code Ann. § 39-13-204(i)(8).

We further conclude that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. "In determining whether the evidence supports the jury's finding, the proper standard is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstance(s) outweighed the mitigating circumstance(s) beyond a reasonable doubt." State v. Stephenson, 195 S.W.3d 574, 593

13

(Tenn. 2006). A rational juror could have found that the (i)(2) and (i)(8) aggravating circumstances outweighed the various mitigating circumstances beyond a reasonable doubt.

Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). We are mindful of the following principles applicable to proportionality review:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. See State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997). In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. See id.

The proof in this case showed that the defendant and Mr. Sanderson strangled a fellow inmate to death with a sock. The defendant's stated motives were that the victim was a "baby raper" whose sentence was not long enough and that the killing would get the defendant back into court, giving him an opportunity to escape. The victim, a middle-aged man with no mentioned physical or psychological condition, had done nothing to provoke the defendant.

14

The defendant, a white male, was twenty-one years old at the time of the murder. He had a prior criminal history, including convictions for first degree premeditated murder, aggravated assault, and two counts of attempted first degree premeditated murder. He showed no remorse for the killing and cooperated minimally with authorities. The defendant presented mitigating evidence that he had a difficult childhood and a history of substance abuse. He has shown the potential for rehabilitation by discipline-free conduct in prison during the two years prior to the sentencing hearing.

Based on an exhaustive review of the record and Tennessee Supreme Court Rule 12 reports, we conclude that the sentence of death imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The sentence of death has been upheld in numerous similar cases involving aggravating circumstances (i)(2) and/or (i)(8). See, e.g., State v. Hugueley, 185 S.W.3d 356 (Tenn. 2006) (murder of middle-aged corrections counselor by inmate; (i)(2), (i)(5) (heinous, atrocious or cruel), (i)(8), and (i)(9) (corrections employee) aggravators); State v. McKinney, 74 S.W.3d 291 (Tenn. 2002) (murder of off-duty law enforcement officer by twenty-three-year-old male with prior conviction for aggravated robbery; (i)(2) aggravator); State v. Henderson, 24 S.W.3d 307 (Tenn. 2000) (murder of uniformed police officer by twenty-four-year-old male while in custody with intent of escaping; (i)(8) and (i)(9) (law enforcement officer) aggravators); State v. Sutton, 761 S.W.2d 763 (Tenn. 1988) (murder of fellow inmate; (i)(2), (i)(5) (heinous, atrocious or cruel), and (i)(8) aggravators).

We reiterate that "our objective is not to 'search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and to invalidate the aberrant death sentence.'" State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002) (quoting Bland, 958 S.W.2d at 665). After reviewing the cases discussed above, and many others not specifically cited, we are of the opinion that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances beyond a reasonable doubt, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The sentence of death shall be carried out as provided by law on the 13th day of September, 2011, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant, Joel David Schmeiderer, is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, CHIEF JUSTICE