IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2013

**ADRIAN DEANGELO TODD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 06-07199     J. Robert Carter, Jr., Judge**

---

**No. W2012-00442-CCA-MR3-PC  - Filed May 7, 2013**

---

The petitioner, Adrian Deangelo Todd, appeals the post-conviction court's denial of his petition for post-conviction relief from his second degree murder conviction. On appeal, the petitioner argues that the post-conviction court abused its discretion in denying his request for a continuance of the post-conviction hearing and that he received the ineffective assistance of counsel at trial. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

J. Jeffrey Lee, Memphis, Tennessee, for the appellant, Adrian Deangelo Todd.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Betsy Weintraub, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of second degree murder arising out of his killing of Mario Hampton, which he claimed to be in self-defense. State v. Adrian Todd, No. W2008-02446-CCA-R3-CD, 2010 WL 2696687, at *1, *6 (Tenn. Crim. App. July 8, 2010), perm. app. denied (Tenn. Nov. 12, 2010). This court affirmed his conviction on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. Id.

The underlying facts of the case were recited by this court on direct appeal as follows:

Angela Hampton Threlkeld, the victim's mother, testified that her son was shot to death on March 15, 2006. He was twenty-eight at the time of his death.

Witness A,[1] an eyewitness to the shooting, testified that he was thirteen at the time of the shooting. He and witnesses B, S.H., M.S., and an unnamed fifth boy were walking to Jack's Food Store on March 15, 2006, when they saw the victim sitting in his gold Grand Marquis in the store's parking lot. Witness A said that he knew the victim through his older brother, so he stopped to speak with him. Witness A testified that he was on the driver's side of the victim's car "within hand-shaking distance." They spoke with the victim for fifteen minutes before a man approached the passenger's side of the car. Witness A said that the man had been standing in front of the store before walking to the victim's car. The man was wearing brown pants, with the right pant leg rolled up, and a hat. Witness A recognized the man from seeing him in the apartment complex where the witness lived and knew him as "Todd." Witness A stated that the man said, "'Hey, bro'" to the victim. According to witness A, the man began shooting before the victim had a chance to respond. Witness A described the shooter's weapon as a large black handgun. Witness A testified that the man held the gun inside the car, through the passenger's window, which was rolled down. He heard six shots. Witness A testified that the victim did not have a weapon.

Witness A testified that he and the other boys ran to the back of the store after the shooting, and he saw the victim drive out of the parking lot and hit a curb. The shooter ran away in a different direction than the boys. When the shooter left, the boys ran towards their home in the Bent Tree Apartments. Along the way, S.H.'s cousin, Tahirah Maxwell, picked them up in her car and took them to the victim's girlfriend's apartment. They told his girlfriend what happened and took her to the location of the shooting. Witness A said that he went home without speaking to the police at the scene because he was scared.

Witness A further testified that he spoke with police "at some point"

---

[1] It is the policy of this court to protect the identity of minor witnesses by using their initials; however, two witnesses have the same initials, D.W., therefore, we will refer to them as Witness A and Witness B. Witness A and Witness B are twin brothers.

after the shooting. The police showed him two photospreads. From the second photospread, he chose a photograph of the [petitioner] and identified him as the shooter. Witness A also identified the [petitioner] in the courtroom as the shooter.

Witness B, an eyewitness to the shooting and witness A's twin brother, testified that he and witnesses A, S.H., M.S., and an unnamed fifth boy were walking to Jack's Food Store on March 15, 2006, when they stopped in the parking lot to talk to the victim. After approximately ten minutes, a man wearing brown pants with the right pant leg rolled up and a brown and white shirt approached the passenger's side of the victim's car. The man said, "'Hey, you remember me?'" The victim did not respond. Witness B testified that "[the victim] turned towards [the man,] and he started shooting." Witness B heard five shots, and he said that the shooter was holding the gun inside the car. Witness B did not see the victim with a weapon, nor did he see the victim reach for anything.

Witness B testified that, after the shooting, the victim said that he had been hit, and he drove out of the parking lot, crashing into the Cazassa Apartments. Witnesses B, A, and S.H. ran in one direction while M.S. and the fifth boy ran in another direction. S.H.'s cousin, Ms. Maxwell, picked up witnesses B, A, and S.H. and took them to the victim's girlfriend's apartment. They took his girlfriend to the crime scene and went home. Witness B testified that the police showed him photospreads, but he was unable to identify the shooter. Witness B identified the [petitioner] in the courtroom as the shooter.

S.H., an eyewitness to the shooting, testified that he was twelve years old on March 15, 2006. On that day, he and four friends were walking to Jack's Food Store when they stopped to talk to the victim, who was sitting in his car in the store's parking lot. S.H. knew the victim because he previously had dated the victim's step-daughter. S.H. testified that approximately fifteen other people were standing in front of Jack's Food Store while he and his friends were speaking to the victim. One of those people, a man in a brown and white jogging suit with the right pant leg rolled up, approached the passenger's side of the victim's car. The man said, "'Hey bro'" to the victim and pulled a black handgun from his waistband. Then, the man fired six shots at the victim. S.H. did not hear the victim say anything or reach for anything prior to the man shooting him. When the man began shooting, S.H. ran away with the twins, witnesses A and B. He said that M.S. and the fifth boy ran in

-3-

a different direction. S.H. saw the shooter run between Jack's Food Store and a neighboring building. He heard the victim say that he had been shot, and he saw the victim drive away and crash into the fence of the Cazassa Apartments. As he and the twins were running, his cousin, Ms. Maxwell, stopped to pick them up in her car. She took them to the victim's girlfriend's apartment. S.H. said that the twins told the girlfriend what happened, and they took her to the scene of the shooting. The police were already there, but he did not speak with the police at that time because he was scared. He eventually spoke with investigators, who showed him photo lineups. He was unable to identify the shooter from the photographs, but he identified the [petitioner] in the courtroom as the shooter.

M.S., an eyewitness to the shooting, testified that he was thirteen years old on March 15, 2006. On that day, he and four friends were walking to Jack's Food Store on Winchester when they stopped to talk to the victim, who was in his car in the store's parking lot. While they were talking to the victim, a man, whom M.S. identified as the [petitioner], approached the vehicle. The [petitioner] said, "'What's up?'" to the victim, and he "stuck his arm through the window." The [petitioner] then shot the victim. M.S. said that the victim had just begun turning his head toward the [petitioner] when the [petitioner] shot him. M.S. did not see the victim reach for anything. M.S. began running after the first shot. He said the gun was close enough that "[his] ears started ringing." M.S. heard two more shots after he began running. He looked back at the victim and saw the victim crash his car into the Cazassa Apartments' gate, which was across the street from Jack's Food Store. M.S. said that he ran home and did not speak to the police at any point after the shooting.

Tahirah Maxwell, S.H.'s cousin, testified that on March 15, 2006, she was driving to work when she heard gunshots. She had to swerve to avoid hitting a car that crossed the road and hit the fence of an apartment complex. She later learned that the car belonged to the victim. Ms. Maxwell testified that, after she avoided the car, she saw S.H. and the twins running, so she stopped to pick them up. Then, she took them home.

Memphis Police Officer Marlon Wright, of the crime scene investigation unit, testified that he collected three spent .45 caliber bullet casings from the victim's Grand Marquis. He did not find a weapon in the car.

Dr. Karen Elizabeth Chancellor, the Chief Medical Examiner for

Shelby County, testified that she performed an autopsy on the victim in March 2006. She determined that the victim died from multiple gunshot wounds. Dr. Chancellor testified that the victim had gunshot entrance wounds on his right shoulder, right arm, and the right side of his torso. She opined that the two projectiles that entered his right arm might have exited the arm and re-entered the torso, but she could not determine that with certainty. She said that it was possible that five separate bullets hit the victim. Dr. Chancellor recovered three bullets from his body. She testified that the bullet that entered the victim's right shoulder passed through his heart and right lung. The bullets that entered through his torso passed through his liver, right kidney, inferior vena cava, and small intestines. Dr. Chancellor testified that any of the wounds could have caused the victim's death. She could not determine with certainty at what distance the shooter held the gun from the victim's body, but she was able to determine that the weapon was not in contact with the body. Dr. Chancellor testified that the victim's blood alcohol content was negative, but he tested positive for THC, the active component of marijuana.

Brian Beauford, an emergency medical technician with the Memphis Fire Department, testified that he responded to a gunshot call on March 15, 2006, in the area of Winchester Road and Cazassa Road. When he arrived, he observed the victim "slumped over" the steering wheel of a vehicle that appeared to have run over a wrought iron fence nearby. He placed the victim on a stretcher and transported him to the Regional Medical Center.

Memphis Police Officer Ricky Davison, of the crime scene investigation unit, processed the victim's car at the crime scene garage. He collected a forty-five caliber bullet casing from under the driver's seat, a bullet fragment that was lodged in the bottom of the driver's seat, a spent bullet from under the seat, a spent bullet pulled from the right door post on the passenger's side, and a fabric sample with a bullet hole from the driver's seat. Officer Davison testified that he did not find a weapon in the vehicle nor anything else of significance.

Memphis Police Sergeant Caroline Mason, the case coordinator overseeing the investigation into the victim's homicide, testified that she received information about three young boys, whom a witness had seen running from the crime scene towards the Bent Tree Apartments. She learned that two of the boys might be twins, so she asked the manager of the Bent Tree Apartments whether twins lived in the complex. Sergeant Mason learned that witnesses A and B lived in the complex with their mother, so Sergeant

Mason and her partner, Sergeant Mullins, went to their apartment. The twins were home, and S.H. was also with them. Sergeant Mason took the twins and their mother to the homicide office, and Sergeant Mullins took S.H. and his guardian. They interviewed the boys individually, and each boy gave statements. From them, Sergeant Mason learned that the suspect was called "Todd" and lived, at one time, in the Bent Tree Apartments. Her team canvassed the apartment complex and learned the [petitioner]'s full name. She prepared a photospread with the [petitioner]'s picture and showed the photospread to Witness A, Witness B, and S.H., individually, at the twins' home. Sergeant Mason said that two of the boys identified the [petitioner]. She made contact with the [petitioner] by telephone, and they agreed to meet at the homicide office to talk.

Sergeant Mason testified that the [petitioner] read an advice of rights form and indicated that he understood his rights and wished to speak with her without an attorney present. In the [petitioner]'s first statement, he denied knowing the victim. He said that on March 15, 2006, he visited a female friend in the Bent Tree Apartments after he got off work. He took her to cash her check at a store on Winchester Road, which was near the scene of the homicide. While at the store, he saw the man from whom he had purchased his car and had a discussion with him about a purported agreement that the man would repair the car's brakes. The [petitioner] said the man became upset and reached into his waistband, as if reaching for a gun. The [petitioner] backed away and got into his car with his friend. They went to Walmart, and then he took her home. After he took her home, he was involved in a car accident and went to the hospital. The [petitioner] said that he wore a white, burgundy, and tan jersey that day with the number twenty-three on it, and brown pants. Sergeant Mason said that she obtained still photographs from the liquor store's video footage that confirmed the [petitioner] had been there. After the [petitioner] reviewed his written statement, he admitted that he had not been truthful and wanted to make another statement.

Sergeant Mason testified that in his second statement, the [petitioner] said that he encountered the victim when he and his friend were driving out of the Jack's Food Store parking lot on their way to Walmart. The victim accused him of cutting him off. Sergeant Mason described the encounter as a "mild road rage incident." The [petitioner] said that he took his friend to Walmart, then back to Jack's Food Store, then to her home. While he was at the Bent Tree Apartments, he retrieved a gun from his trunk and armed

-6-

himself. Then, he went back to Jack's Food Store again and encountered the victim for the second time that day. The [petitioner] said that he believed the man from whom he had purchased his car had sent the victim because of the confrontation they had earlier that day. He was scared, but he approached the victim, who was sitting in his car talking to several young boys. The [petitioner] said that "he thought he saw [the victim] going for a gun, at which time he started shooting into the car." Then, he got into his car and drove away, eventually having the car accident he had previously mentioned. The [petitioner] said that he threw his gun out of his car window, but the police were unable to locate the weapon where the [petitioner] said it might be.

Id. at *1-5.

On April 5, 2011, the petitioner filed a *pro se* petition for post-conviction relief, in which he raised, among other things, various allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing on November 10, 2011.

At the hearing, counsel testified that he had been an attorney since 1993 and had handled approximately twenty murder cases. He visited the petitioner in jail at least ten times over the course of his representation. During those visits, they discussed legal strategies, and the petitioner seemed to understand their strategy in the case. They discussed whether the petitioner should testify at trial and hoped that a statement the petitioner gave to police would suffice in lieu of him testifying.

Counsel testified that, during the course of his investigation, the petitioner gave him the name of Donyea Smith as a witness. Counsel spoke to Smith and got a statement, "but it didn't prove very helpful." He recalled that Smith "didn't remember a confrontation or what [the petitioner] was wanting her to remember. She just didn't remember it." Counsel did not recall hearing about another witness – a worker at an audio store who saw some young people running from the scene. He said that there were young people who ended up being eyewitnesses against the petitioner, and no one ever implicated them in the shooting. He recalled that he talked to everyone the petitioner thought might know something about the case.

Counsel testified that the case was covered by the television show The First 48. He said that he "saw the footage that they said they recorded." He recalled that he litigated many motions involving the show, particularly trying to get "the judge to either suppress [the petitioner's] written words because we didn't have a copy of the complete confession taped[,] and [t]here was a snippet during the show that just lasted seconds where [the petitioner] seemed to break down and apologize for what he did." He elaborated that he

wanted to "get a larger piece of that confession . . . [because the petitioner] seemed to be setting up a self-defense claim in that little bit of a video." He attempted to obtain more footage but was informed by the television show "that they had given us everything that they had and the rest was destroyed."

Counsel acknowledged that he misspoke at the beginning of his opening statement by saying that the petitioner had pled guilty to the charge, but he immediately corrected himself. Asked if such misstatement could have confused the jury, counsel responded, "Well, he wasn't convicted of first-degree murder so I don't know if it confused them or not. I guess it could have." Counsel said that one of the petitioner's biggest defense strategies was to try to bring out the victim's "violent behavior or . . . propensity to have a weapon" through the testimony of the victim's mother, but the trial court would not allow such testimony. He did not recall if they had a jury-out hearing for him to question the victim's mother about whether the victim was known in the community for carrying a gun.

Counsel testified that there were minor discrepancies in some of the witnesses' accounts of what the petitioner said to the victim right before the shooting; however, he did not feel that pointing out those discrepancies was "that important to the defense." He elaborated, "I don't know what good it does to focus on how you say hello to someone or whatever. We were concentrating on trying to put a gun in [the victim]'s hand . . . or something that would possibly negate first-degree murder, premeditation." Likewise, he did not feel that inconsistencies in the accounts of what the petitioner was wearing was helpful because the petitioner admitted he was at the scene and committed the shooting. He explained that identification of the petitioner was not at issue; what was at issue was the circumstances surrounding the shooting and why the petitioner did it.

Counsel testified that he did not recall any forensics reports saying that bullets found in the victim's car came from a gun other than the gun the petitioner admitted having. Counsel said that he did not recall "the distance of the gun from the victim" being an important issue at trial. He also did not recall the medical examiner's testimony that she could not determine with certainty the distance between the shooter and the victim but said he would not be surprised by such testimony.

Counsel testified that he did not view the petitioner's two statements to police as being inconsistent, instead he saw the second one "as really filling in the blanks on what he'd left out of the first statement." He said that they would have had an easier time arguing that the petitioner was not the shooter had the petitioner not given a statement to police that "he did the shooting." After the petitioner admitted to the shooting, they were mainly concerned with trying to avoid a first degree murder conviction and life sentence. He felt that the verdict was "a very favorable verdict for [the petitioner]." He did not litigate the

admissibility of the petitioner's statement "because it had a self-defense element to it," and he hoped the statement would "get [the petitioner's] story in" without him having to testify.

Counsel testified that he was not involved in the appeal or had any input as to what issues to raise. He did not recall any evidence in the State's possession that was not disclosed during discovery.

The petitioner testified that counsel visited him in the jail about ten times before and during trial. He said that, if Donyea Smith had testified at trial, she would have testified that he had an altercation with a couple of men prior to the shooting and the victim had "jump[ed] out on [him] in the middle of traffic . . . waving his hands, [and] hollering[.]" He was not aware of Smith ever saying at some point that she could not provide helpful testimony. He said that Smith was willing to testify at trial, but counsel never got his investigator to locate her. He claimed that "the judge . . . was going to take it upon herself to locate [Smith] because that was the problem at first they couldn't never locate her. You know from my understanding they never did talk to her. They couldn't never find her."

The petitioner stated that there was also an employee of an audio store who told the police that the day of the shooting "he saw three guys run past the store and one of the guys had his hands down in his pants." He said that the "three guys" were the same young men at the scene who testified against him.

The petitioner testified that The First 48 episode appeared edited and pieced-together, as if "some of it was cut out." He believed that the "raw and uncut" version would have been helpful to his defense had it been shown to the jury. He stated that he heard inconsistencies in the witnesses' testimony at trial that counsel did not properly highlight. For instance, one witness said the victim's "arm was down and one said his arm was up and one said he was leaning and one said he didn't saying nothing[.]"

The petitioner acknowledged that none of the witnesses testified that they saw the victim with a gun. He also acknowledged that he did not see the victim with a gun either, although he "thought he had a gun." He admitted that he and counsel went over the discovery and talked about what the State's proof would be at trial, including witnesses it would call.

On December 1, 2011, the post-conviction court entered an order denying post-conviction relief. The court found that counsel met with the petitioner numerous times and performed a thorough investigation into the facts of the case. The court noted that the petitioner did not deny shooting the victim and that the theory of defense was self-defense. The court observed that the petitioner admitted that the footage from The First 48 was

inaccurate but "maintains that he now thinks it should have been shown to the jury." The court noted that counsel attempted to obtain the "raw footage" from The First 48 but, "[i]n the end, he obtained what the producers said was all that existed." However, the court observed that "[t]his issue was collateral, . . . as the trial court was not allowing any of the footage to be used in the trial." The court found that it was unclear what Donyea Smith "would have added" had she testified at trial for the petitioner. The court determined that the petitioner "seems unhappy with his Murder Second conviction . . . and seems to feel that his trial attorney is somehow to blame, but really offers no specific instances of deficient performance." The court concluded that the petitioner failed to prove his claims by clear and convincing evidence.

## ANALYSIS

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### I. Continuance

The petitioner first argues that the trial court abused its discretion in denying his request for a continuance of the post-conviction hearing in order for him "to secure the testimony of crucial witnesses," namely, Donyea Smith and an unnamed audio store worker. He claims that such testimony was "relevant to the deficient performance of Trial Counsel."

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to

grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

We initially observe a threshold problem with the petitioner's argument is that there is nothing in the record to show that a motion for a continuance was ever filed. There is no order disposing of a motion for continuance, or a transcript showing that there was an oral motion and oral disposition. The petitioner discusses this issue in his brief but does not cite any place in the record referring to such motion. It is the petitioner's duty to provide a record that is sufficient "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(a), and a defendant who fails to make an argument on an issue or appropriate citations to the record waives the issue on appellate review. See Tenn. R. App. P. 27(a)(7) ; Tenn. Ct. Crim. App. R. 10(b). This issue is waived.

Even if the record were sufficient for this court to review the petitioner's claim, he would nonetheless not be entitled to relief. Counsel testified that he spoke to Donyea Smith and got a statement from her, "but it didn't prove very helpful." He recalled that Smith "didn't remember a confrontation or what [the petitioner] was wanting her to remember. She just didn't remember it." As to the worker at the audio store who saw some young people running from the scene, counsel testified that he did not recall hearing about such a witness. However, he said that there were young people who ended up being eyewitnesses against the petitioner, and no one ever implicated them in the shooting. Therefore, we discern no prejudice to the petitioner by Donyea Smith and the unnamed audio store worker not testifying at the hearing.

## II. Ineffective Assistance of Counsel

The petitioner argues that he received the ineffective assistance of counsel because counsel: (1) failed to present the original footage of The First 48 television show; (2) incorrectly misstated to the jury that the petitioner pled guilty to the indictment; (3) failed to highlight the inconsistencies in the witnesses' testimony; and (4) failed to present proof regarding the distance between the petitioner and the victim.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn.

-11-

Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. The First 48

The petitioner argues that counsel was ineffective for failing to present the original footage of The First 48 television show. Counsel testified that he saw the footage the television show said that it had recorded and wanted to get more footage because the

petitioner "seemed to be setting up a self-defense claim in that little bit of a video" that was available. Counsel said that he attempted to obtain more footage but was informed by the television show "that they had given us everything that they had and the rest was destroyed." We cannot conclude that counsel performed deficiently for being unable, despite his best efforts, to procure any additional footage. Moreover, the fact that post-conviction counsel was evidently unable to come up with this footage at the post-conviction hearing lends credence to counsel's testimony and is also fatal to the success of this claim because there has been no showing of what that evidence would have been in order to establish prejudice. See Davis v. State, 912 S.W.2d 689, 698 (Tenn. 1995).

## B. Misstatement to the Jury

The petitioner next argues that counsel was ineffective because he incorrectly misstated to the jury in his opening statement that the petitioner pled guilty to the indictment. The record reflects that counsel stated: "In this file is the indictment. It is what the state just read to you and it is what [the petitioner] just pled guilty to -- I mean he pled -- we plead not guilty to." At the evidentiary hearing, counsel acknowledged that he misspoke but was doubtful that it confused the jury, as the jury did not convict the petitioner of first degree murder. However, he "guess[ed] it could have" confused the jury.

We cannot conclude that the petitioner received ineffective assistance of counsel. A defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996); see also Moffitt v. State, 29 S.W.3d 51, 55 (Tenn. Crim. App. 1999) ("Effective assistance is not flawless, perfect, or error free assistance[.]"). Moreover, considering that the petitioner admitted to shooting the victim and he escaped a first degree murder conviction, we do not see how the petitioner was prejudiced by counsel's quickly-corrected misstatement.

## C. Inconsistencies in Witnesses' Testimony

The petitioner argues that counsel was ineffective because he failed to highlight the inconsistencies in the witnesses' testimony. He elaborates that the three young men who witnessed the shooting gave inconsistent testimony regarding what the petitioner said immediately before the shooting. He recalls that "one witness stated that [the petitioner] said 'Hey, Bro,' a second witness stated that [the petitioner] stated 'Hey, do you remember me?' while a third witness stated that [the petitioner] stated 'What's up?'" He claims that "[t]hese differences go directly to whether these witnesses can accurately recall the events on the night of the shooting."

At the evidentiary hearing, counsel testified that there were minor discrepancies in

some of the witnesses' accounts of what the petitioner said to the victim right before the shooting; however, he did not feel that pointing out those discrepancies was "that important to the defense." He elaborated that he thought it was a better tactic to negate the element of premeditation or try to prove the killing was in self-defense rather than focus on such minor inconsistencies. Deference is given to reasonably based trial strategies and tactical decisions made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). The record shows that counsel's decision to not focus on minor inconsistencies in the witnesses' accounts was a reasonable tactical decision made after adequate preparation; therefore, we discern no deficiency in counsel's performance. Moreover, we fail to see how the outcome of the trial would have possibly been different had counsel highlighted such trivial inconsistencies.

### D. Proof Regarding Distance Between the Petitioner and the Victim

The petitioner lastly argues that counsel was ineffective because he failed to present proof regarding the distance between the petitioner and the victim. He asserts that "[p]roviding information regarding the distance between [the petitioner] and the victim is consistent and would have aided Trial Counsel's strategy of self-defense because it goes to how well [the petitioner] could have seen whether the victim was armed."

At the evidentiary hearing, counsel testified that he did not recall "the distance of the gun from the victim" being an important issue at trial. He also did not recall the medical examiner's testimony that she could not determine with certainty the distance between the shooter and the victim but said he would not be surprised by such testimony because "they would say that on every case unless there was soot or stippling around the wound."

Again, the petitioner is complaining that counsel was ineffective for failing to present proof on an issue but has himself failed to present proof on the issue at the post-conviction hearing to prove prejudice. See Davis, 912 S.W.2d at 698. The petitioner failed to even state in his brief what proof counsel should have presented or demonstrate how this alleged proof would have made a difference in the outcome of trial.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE