IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 7, 2010 Session

## LARRY J. NOEL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lauderdale County**
**No. 7646      Joseph H. Walker, III, Judge**

**No. W2010-00088-CCA-R3-PC  - Filed March 3, 2011**

The petitioner, Larry J. Noel, appeals the denial of his petition for post-conviction relief, raising the following four issues on appeal:  (1) whether his pretrial transfer of custody to the Department of Correction subjected him to double jeopardy and violated his due process rights; (2) whether he was incompetent to stand trial due to a stroke he suffered less than a month prior to trial; (3) whether he was denied the effective assistance of counsel at trial and on appeal; and (4) whether the post-conviction court erred by denying his motion for a continuance due to the unavailability of witnesses.  Following our review, we affirm the denial of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Vanedda Prince Webb, Dyersburg, Tennessee, for the appellant, Larry J. Noel.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; D. Michael Dunavant, District Attorney General; and Tyler R. Burchyett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2005, the petitioner was convicted by a Lauderdale County jury of attempted first degree murder, aggravated assault, retaliation for past action, unlawful possession of a weapon, and driving on a revoked license, and was sentenced by the trial court to an effective term of twenty-three years in the Department of Correction.  After his convictions were

affirmed by this court on direct appeal, our supreme court granted his application for permission to appeal for the sole purpose of remanding to the trial court to consider whether his conviction for aggravated assault should be merged into his conviction for attempted first degree murder and whether the judgment forms should be amended to reflect the trial court's order of consecutive sentencing. State v. Larry J. Noel, No. W2005-01958-CCA-R3-CD, 2006 WL 2242067 (Tenn. Crim. App. Aug. 4, 2006), perm. to appeal granted (Tenn. Dec. 18, 2006).

Our direct appeal opinion reveals that the petitioner's convictions arose out of his actions on April 13, 2004, in which he shot his estranged wife in her vehicle on the same day they had appeared in court and she had been granted an order of protection against him. Id. at *1-7. After the shooting, the petitioner turned himself in to the police, confessing to Lieutenant Steve Sanders of the Ripley Police Department that he had "just shot and killed [the victim] up the street." Id. at *5. The petitioner also confessed the shooting to the booking officer at the jail. Id. at *4.

One of the principal witnesses for the State was Marshall Ricks, a former employee of the petitioner's auto body shop, who was a passenger in the petitioner's vehicle at the time that the petitioner cut the victim off, blocked her vehicle with his vehicle, pulled a gun out of his pants, and fired two shots at the victim through his open driver's side window. Id. at *2-3. In addition to describing the shooting, Ricks testified that after he and the petitioner had left the courtroom that morning, the petitioner told him that "he had a gun and 'could have killed them in court,' but [Ricks] never saw the gun." Id. at *3. Another witness for the State was Keith Chaney, a friend of the petitioner's, who testified that on the day before the shooting, the petitioner told him that if things did not go in his favor at the next day's court hearing, he "'was going to do something to [the victim],' and that 'she'd be dead before lunchtime.'" Id. at *1.

The petitioner filed a *pro se* petition for post-conviction relief on December 20, 2007, followed by an amended petition on April 30, 2008, in which he raised a number of different claims, including ineffective assistance of counsel. His ineffective assistance of counsel claim is based on allegations that counsel, among other things, failed to adequately confer with the petitioner prior to trial, failed to properly investigate the case and develop defense theories, failed to effectively represent the petitioner at sentencing, and failed to raise various meritorious issues on appeal. His claim that the post-conviction court erred by denying his motion for a continuance is based on his argument that he was prejudiced by the fact that two of his subpoenaed witnesses, Marshall Ricks and Thomas Cherry, were unavailable at the evidentiary hearing.

At the beginning of the evidentiary hearing, post-conviction counsel announced that several of the petitioner's witnesses were unavailable at the time and requested that the court continue the hearing to another date. The post-conviction court denied the motion, noting that the case had already been reset "multiple times," and would be held on that date but that the court would possibly leave the proof open, provided that post-conviction counsel could show him that the witnesses were essential. However, after later hearing from post-conviction counsel about what each witness's expected testimony would entail, the court ruled that the proof would not be held open.

The petitioner testified that as he was awaiting trial in the case, the trial court entered an order transferring his custody to the Department of Correction. Consequently, he was moved from the Lauderdale County Jail, where he had been housed since his arrest, to Riverbend Maximum Security Prison in Nashville. The petitioner testified that he was twice injured while he was housed at the jail, including once when "something hit [him] behind the ear" and he ended up with broken teeth and bloody clothing.

The petitioner testified that the injuries he sustained at the Lauderdale County Jail were "no fault of [his] own" and that he was not present for the hearing at which the trial court transferred his custody. He stated that he was assigned a TOMIS number upon his transfer to the Department of Correction and was disciplined while at Riverbend by having his telephone privileges revoked, which meant he was unable to contact his attorney. He said that while he was at the jail he met once with junior trial counsel for approximately twenty minutes and once with senior trial counsel for fifteen to twenty minutes. While at Riverbend, he never met or spoke with junior trial counsel and met with senior trial counsel only three times. During one of those meetings, senior trial counsel accused him of bothering counsel's family and put his finger in the petitioner's face, which led to their getting into a physical altercation and a prison officer asking counsel to leave. The petitioner testified that he no longer trusted senior trial counsel after that incident and therefore asked the trial court to remove him. The court, however, refused his request.

The petitioner complained that he gave trial counsel a list containing approximately thirty items, including the names of witnesses who would be helpful to his defense, but counsel failed to investigate them. Included among the potential witnesses he mentioned were the following: employees named Maria Stewart, Michael Jones, and "Portia," who, according to the petitioner, could have testified that the petitioner had terminated Ricks after one day of employment because Ricks was drinking; "the young ladies across the street" from the petitioner's shop, who could have "verified that . . . Mr. Ricks was lying" when he testified that the petitioner was driving the vehicle because the petitioner never drove; Louis Driver, from whom the victim was rumored to have attempted to purchase a gun; Rufus Baldwin, who could have testified that it was Chaney and not the petitioner who made the

threatening statement about killing the victim; and Jon Pavletic, the bailiff who was working on the day of the order of protection hearing, who could have testified that the petitioner did not set off the metal detector and that the bailiff had patted him down before he entered the courtroom.[1]

The petitioner testified that he asked counsel to investigate the phone records from his shop because they would have proved that the victim had been in contact with him before the order of protection was entered, but counsel failed to do so. He said he also asked counsel to investigate the victim's 1995 arrest in Hayti, Missouri, for gun possession because such evidence would have shown that the victim had perjured herself. The petitioner identified the record of the victim's June 23, 1995 arrest for carrying a concealed weapon, which was then admitted as an exhibit to the hearing.

The petitioner stated that he wanted Ricks called as a witness at the evidentiary hearing because he believed that he could be made to tell the true story of what had happened during the shooting. According to the petitioner, the victim had "a gun in the front of [her] windshield," he "pulled [his] gun up to let her know that [he] had a weapon and . . . wanted to leave," and his gun went off when Ricks grabbed him.

The petitioner testified that he was not feeling well on May 19, 2005, as officers were transporting him from Nashville to Lauderdale County and that he was taken to the hospital following his arrival at the jail. According to the petitioner, a physician who examined him at the hospital told him that he had had a small stroke but that it did not explain the severity of the petitioner's symptoms. The petitioner testified that he was still feeling the effects of the stroke at the time of his trial, with difficulty walking, a loss of strength on the right side of his body, a lack of stamina, and an inability to consistently focus on the proceedings.

The petitioner testified that counsel never told him that he had the option of being sentenced under either the current sentencing statute or the statute in existence at the time he committed the offenses. He also complained that counsel did not present the mitigation evidence at sentencing he requested, such as the testimony of several young members of his church about his involvement with the "Youth Day" program at the church.

On cross-examination, the petitioner testified that junior trial counsel was initially appointed to represent him, but he was not happy with her representation and filed a motion

---

[1]Officer Rhonda Mack of the Lauderdale County Sheriff's Department testified at trial that as she was booking the petitioner into the jail, he mentioned that he had had the gun in the back of his pants as he was entering the courtroom and that the metal detector had gone off, but he had told the officer who stopped him that it was his belt buckle.

to have her dismissed. At that point, senior trial counsel took over the case. The petitioner acknowledged that he had had four different post-conviction counsel in the present proceedings, which included his current post-conviction counsel, whom he had originally asked to have dismissed and then, following the dismissal of two successor attorneys, asked to have reinstated. He further acknowledged that he had asked for the recusal of the judge who presided at the trial and post-conviction hearing, as well as the prosecutor in the post-conviction hearing.

Norma Cotton, the victim of the shooting, testified that the 1995 possession of weapon charge occurred when a policeman who had stopped the vehicle in which she and the petitioner were traveling found a gun in her bag of laundry. The victim stated that she knew that the petitioner must have placed the gun in her bag, although she did not see him do it, because she had never owned a gun. She said she was questioned, but not arrested, for the incident. She also denied that she pulled a gun on the petitioner when they were in Illinois for his son's funeral.

Tony Samuels testified that shortly after the petitioner was arrested for shooting the victim, Marshall Ricks asked him for a ride to the store. He said that Ricks had a gun with him at that time and told him that "Ms. Norma" had paid him to get rid of it. He stated that senior trial counsel talked to him about the incident sometime before the petitioner's trial.

Lauderdale County Sheriff Steve Sanders testified that he had known the petitioner his whole life and could not recall anything that was remarkably different about his condition at trial from his usual condition. He said he did not remember the petitioner's having been in a wheelchair during the trial.

Terry Stowe, the petitioner's brother, testified that the petitioner had had a stroke and was in a wheelchair at the time of his trial.

Kenneth Stowe, the petitioner's brother, testified that he asked Mr. Pavletic whether the petitioner had had a gun with him in the courtroom that morning and reported what he learned from Pavletic to the petitioner, but not to trial counsel.

Jon Pavletic, who was serving as bailiff for the Lauderdale County General Sessions Court in April of 2004, testified that there was a metal detector at the courtroom door through which the petitioner would have had to walk to enter the courtroom. He could not recall the petitioner's order of protection hearing, but he said that he was trained in the use of the metal detector, would have waved a hand detector over the person of anyone who set it off while entering the courtroom, and probably would not have mistaken a gun for a belt buckle.

Kenny Leggett, the former Deputy Chief of the Ripley Police Department, testified that he had performed a background check on the petitioner sometime prior to 2004 and, based on the results, had returned a gun to the petitioner.

Rhonda Childress Mullins, a LPN at the Lauderdale County Jail, testified that, to the best of her knowledge, the petitioner experienced a "cardiac related" incident while en route from Riverbend to the jail and as a result was transported to the hospital.

Maria Stewart Price testified that she had worked for the petitioner for a few weeks but did not know Marshall Ricks.

Sheletha Stowe, the petitioner's niece, testified that she was familiar with a letter that the victim had sent to the petitioner but could not recall when it had been sent and knew nothing about its contents.

Keith Chaney testified that he had been arrested for intent to go armed, but the charge had been dismissed.

Dean Holloway testified that the petitioner had some bruises and was wearing a bloody t-shirt during one of the times that he visited him at the jail. He also said that he was familiar with the victim's vehicle and that it had heavily tinted windows that were difficult to see through. He stated that no one from trial counsel's office ever contacted him.

Senior trial counsel, the Public Defender for the Twenty-Fifth Judicial District, and his co-counsel, one of his assistant public defenders, represented the petitioner in the case. Senior trial counsel testified that the trial court entered an "Order for Safekeeping" that transferred the petitioner's custody to the Tennessee Department of Correction prior to trial. There was no hearing, and the petitioner was already in Nashville by the time he found out that the order had been entered. However, he looked at the order and the rule authorizing the transfer and did not recall "there being a real problem with it."

Senior trial counsel testified that, to the best of his recollection, he never visited the petitioner before his transfer to Riverbend but met with him six or seven times, in visits ranging from forty-five minutes to two hours, after his transfer. In addition, he met with the petitioner at least twice when he was brought back to Lauderdale County for hearings. He acknowledged that the petitioner's transfer to Nashville placed "a burden" on him in terms of travel time and convenience but said that he "seriously doubt[ed]" that it affected the amount of time he spent with the petitioner. He testified that he and the petitioner never had any physical altercation and that their only verbal confrontation consisted of the petitioner's telling him on one visit that he was not "worth a shit." He said that the guards never asked

him to leave as a result of that, or any other, exchange with the petitioner.

Senior trial counsel testified that he never considered the possibility that Ricks had shot the victim because, as he recalled, there were five eyewitnesses to the shooting and none of them, including the petitioner, ever said anything about Ricks having had a gun. He said he learned of the petitioner's hospitalization either on the day he was taken to the hospital or the following day and that it was his understanding that there was something wrong with the petitioner's heart. When he talked to the petitioner, he saw no reason to believe that he was incapable of proceeding to trial.

Senior trial counsel testified that he could not see over the counter when the trial court selected the alternate juror. It was his understanding, however, that the court's practice was to have the jurors' names written on small cards and to "just randomly pull one out" when selecting the alternate. Although he objected to the selection of the alternate juror at trial, the only issue he raised on appeal was the sufficiency of the evidence because that was the only issue that he thought had any merit.

Senior trial counsel testified that when he tried to talk to the petitioner about sentencing, the petitioner told him that his lawyer had told him not to speak with him. Counsel said that he objected to inaccuracies in the presentence report and that the trial court sustained his objection. He stated that he probably "touched on" the topic of the change in the sentencing statute during a visit with the petitioner at Riverbend but when he tried to talk with him about it again on the morning of the sentencing hearing, the petitioner repeated that his lawyer had instructed him not to talk to counsel.

Senior trial counsel testified that the petitioner told him during his first visit that he had given a list of thirty names to junior trial counsel, that he had a copy of the list in his cell, and that he would mail it to senior trial counsel. The petitioner, however, never mailed him the list and when he checked with junior trial counsel, he learned that the petitioner had never given her the list either. On his second visit, the petitioner told him that he was not going to give him the list, so he started recording "every name [the petitioner] dropped." Senior trial counsel testified that he eventually arrived at a list containing fifty-three names and that he made every effort to contact and interview each person on the list. He said he talked to Tony Samuels but did not call him as a witness at trial because "what [Samuels] told [him] wasn't anything . . . like what he just testified to [in the evidentiary hearing]."

On cross-examination, senior trial counsel testified that the petitioner was in a wheelchair during the trial. However, there was nothing about his condition to make counsel think he could not stand trial; the petitioner made comments and suggestions to counsel throughout the trial and, in counsel's opinion, the wheelchair may have garnered him "a little

bit of pity" from the jury.

Junior trial counsel testified that senior trial counsel took the lead role in the case after the petitioner expressed dissatisfaction with her representation and requested that the court appoint different counsel. She said that the petitioner never gave her a list of thirty witnesses but instead mentioned at most only seven names, some of which were merely first names without last names. Junior trial counsel described the petitioner as a "difficult client" who was untrusting and "not very forthcoming with information." She said that her role as co-counsel included securing the services of the forensic psychologist and obtaining and forwarding to her the petitioner's numerous records. In her opinion, the forensic psychologist, who testified that it was a "heat-of- passion crime," was a very strong witness for the defense.

On December 21, 2009, the post-conviction court entered an order denying the petition for post-conviction relief. Thereafter, the petitioner filed a timely notice of appeal to this court.

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn .Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Transfer of Custody

As his first issue, the petitioner contends that the trial court's transfer of his custody from the Lauderdale County Jail to the Department of Correction while he was awaiting trial violated his due process and double jeopardy rights. The State responds by arguing that the transfer of custody, even if improper, does not entitle the petitioner to post-conviction relief because no due process or double jeopardy rights were implicated.

After the briefs had been filed in this case, the petitioner supplemented the record with the State's application to have the petitioner transported for safekeeping in the penitentiary and the trial court's order for transport. The State's application, which was filed on July 27, 2004, was accompanied by an affidavit of the administrator of the Lauderdale County Jail, who stated, among other things, that the petitioner was "a large man who has been verbally disruptive on at least two occasions," that he "has reported to the counselors that he is hearing voices instruct him to do violence to himself and others," that he was refusing to take his prescription heart medication, and that he "has fallen out and broken some of his teeth." The administrator additionally stated that the petitioner's "episodes occur on the second and third shifts" and that it was the administrator's belief that the petitioner was "trying to manipulate the officers into taking him to medical facilities and will attempt to escape as he is being moved." Finally, the administrator stated that his jail was not equipped to house the petitioner properly and keep him safe and that he had contacted "all nearby jails, and they do not have adequate facilities to house and keep safe this prisoner."

That same day, the trial court entered an "Order For Transport Of Prisoner To Penitentiary For Safekeeping," pursuant to Tennessee Code Annotated Code Section 41-4-121. In the order, the court found that the petitioner's conduct had "created disruption and danger in the Lauderdale County Jail," that the jail was unable to control the petitioner, and "that after due inquiry by the Lauderdale County Sheriff's Department," there was "no other jail reasonably close . . . sufficient to house and keep safe this prisoner."

Tennessee Code Annotated section 41-4-121, which the trial court referenced in its order, provides as follows:

> **Safekeeping of prisoners – Sufficient jails.** – (a) The sheriff has the authority, when the jail of the county is insufficient for the safekeeping of a prisoner, to convey the prisoner to the nearest sufficient jail in the state.
>
> (b) In all cases where it is shown to the committing magistrate, judge or court that the jail of the county in which the commitment should be made is insufficient for the safekeeping of the prisoner, the commitment shall be by mittimus or warrant stating the fact to the nearest sufficient county jail.
>
> (c) In all cases where the jail in which a prisoner is confined becomes insufficient from any cause, any circuit or criminal judge, upon the application of the sheriff and proof of the fact, may order the prisoner, by mittimus or warrant, to be removed to the nearest sufficient jail.

Tenn. Code Ann. § 41-4-121 (2010).

The petitioner argues that his pretrial confinement in the penitentiary was "punitive," rather than remedial, and thereby violative of the prohibition against double jeopardy, because "Tennessee Code Annotated § 41-4-121 does not provide authority for such a transfer" and "there was no legal authority supporting the entry of the . . . order." In denying relief on the basis of this claim, the post-conviction court cited State v. Grey, 602 S.W.2d 259, 261 (Tenn. Crim. App. 1980), in which this court analyzed a similar pretrial transfer to the penitentiary pursuant to Tennessee Code Annotated section 41-1125, the predecessor statute to the current one. There, we concluded that the pretrial transfer for safekeeping of a prisoner from the county jail to the state penitentiary, rather than to "the nearest sufficient jail," "would not be justified unless the transferring court found that was *no* nearby jail sufficient to contain the prisoner safely." Id. The trial court in this case made such a finding. Thus, we disagree with the petitioner's contention that the trial court lacked legal authority to enter the order or that his pretrial confinement in the penitentiary somehow subjected him to double punishment for the same offense.[2]

We further disagree with the petitioner's contention that his due process rights were violated when the trial court entered the order without a hearing. The statute does not require that a prisoner be afforded a hearing or an opportunity to present evidence on the matter, and the petitioner failed to show that his confinement in the penitentiary precluded him from meeting with his attorney or otherwise preparing for trial. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

## II. Competence to Stand Trial

The petitioner next contends that he is entitled to post-conviction relief because he was incompetent to stand trial due to the stroke he suffered less than a month before his trial began. The post-conviction court made the following findings and conclusions with respect to this claim:

> On May 19, 2005, [the petitioner] was seen at Baptist Hospital and discharged May 26. Dr. Segal testified by deposition that he treated [the petitioner] during his stay. He was observed to have right-sided weakness a week prior to Dr. Segal's consultation. He had a cardiac cath, and Dr. Segal

---

[2]The State notes in its brief that "the petitioner was given credit on his sentence for both the time he served in the Lauderdale County Jail and with TDOC." The petitioner's judgment forms are not included in the record on appeal. Senior trial counsel testified at the evidentiary hearing, however, that the petitioner's judgments should reflect the presentence credits he earned during all his pretrial incarceration, and the post-conviction court, in its order denying relief, directed the district attorney to "determine the jail credit and prepare [a] corrected judgment form for count one with the pre-trial jail credit."

requested further testing. He believed at first that [the petitioner] had a "small stroke." The test[] results indicated the petitioner should be discharged, as he had functional weakness, "in other words, malingering or just putting on." Petitioner had no difficulty communicating; no difficulty processing information; and was alert and oriented to person, place and time. The MRI was "unimpressive," that is[,] it did not show a stroke. Dr. Segal saw no reason that the petitioner should not stand trial less than a month later. Dr. Segal did not see "any obvious cognitive problems. . . I saw no red flags that would say to not perform." He was being evaluated for right-sided weakness. "I think he was competent to make decisions when I saw him."

Counsel felt petitioner was physically competent to stand trial and able to assist in his defense. Petitioner appeared during trial physically and mentally competent.

The record fully supports the findings and conclusions of the post-conviction court. As the post-conviction court noted, the deposition testimony of Dr. Robert Segal, the neurologist who treated the petitioner at the hospital, was that the petitioner's MRI was "unimpressive," that the petitioner's symptoms were inconsistent with a stroke, and that he suspected malingering. In addition, the petitioner had no difficulty communicating or processing information, was oriented times three, and showed no obvious cognitive problems. In short, Dr. Segal saw no reason that the petitioner could not stand trial. Trial counsel also saw no reason to believe that the petitioner was either physically or mentally incompetent to stand trial, testifying that the petitioner assisted in his defense by making comments and suggestions throughout the trial and that, in counsel's opinion, the petitioner's having been in a wheelchair may have led the jury to view him in a more sympathetic light. The petitioner is not, therefore, entitled to post-conviction relief on the basis of this claim.

### III. Ineffective Assistance of Counsel

The petitioner next contends that the post-conviction court erred by finding that he received effective assistance of counsel at trial and on appeal. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This

requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

### A. Failure to Adequately Confer with Petitioner Before Trial

The petitioner first argues that trial counsel was ineffective for failing to adequately confer with him prior to trial. In support, he cites his testimony that trial counsel met with him only twice before the petitioner's transfer to Nashville and only "about three times" while he was at Riverbend, as well as senior trial counsel's admission that the petitioner's transfer to Riverbend placed "a burden" on his efforts to meet with the petitioner.

In denying relief on the basis of this claim, the post-conviction court accredited senior trial counsel's testimony about the frequency and duration of his visits, finding that the

petitioner had not met his burden of showing that counsel was deficient in this regard. The record fully supports the findings and conclusions of the post-conviction court. Senior trial counsel acknowledged that the petitioner's transfer to Nashville created "a burden," on him and junior trial counsel, but he described it as "a burden we accept and we can deal with." He estimated that he met with the petitioner at Riverbend on six or seven different occasions, in visits that ranged from forty-five minutes to two hours, as well as at least twice in Lauderdale County when the petitioner was brought back for hearings. He also said that he seriously doubted he would have seen the petitioner any more often had he remained continuously confined at the Lauderdale County Jail. The petitioner is not, therefore, entitled to post-conviction relief on the basis of this claim.

## B.  Failure to Adequately Investigate

The petitioner next argues that trial counsel was ineffective for failing to interview all potential witnesses and to fully investigate all potential defenses. In support, he cites his testimony about the list of thirty names he provided to counsel and counsel's failure to investigate or call as witnesses certain individuals he requested that he investigate, such as Tony Samuels, Maria Stewart, Michael Jones, "Portia," Louis Driver, Jon Pavletic, Dean Holloway, or "the young ladies across the street" from the petitioner's shop. He also mentions counsel's failure to obtain his telephone records to prove that he and the victim had been communicating and to investigate the victim's Missouri gun possession arrest in order to impeach her credibility.

The post-conviction court's order denying relief on the basis of these claims states in pertinent part:

> Petitioner testified that counsel did not properly interview witnesses. Petitioner failed to show how counsel was deficient in this regard or how he was prejudiced in this regard. While petitioner alleges that counsel was deficient in not interviewing witnesses, he has failed to show any witness who would have been beneficial to petitioner. Counsel was told by petitioner that he had given a list of witnesses to [junior trial counsel]. There was no such list. Counsel wrote down each name mentioned by petitioner and interviewed each one and those listed on the indictment. Counsel interviewed over fifty possible witnesses. For example, he spoke with Mr. Samuels, who counsel testified did not say anything like what he testified about at the hearing.

> Petitioner has failed to show how counsel was deficient in this regard or any prejudice in failing to call any witnesses.

-13-

We agree that the petitioner has not shown that counsel was deficient for failing to interview or call witnesses or that the outcome of his case would have been different had the witnesses testified on his behalf at trial. We first note that the petitioner failed to call as witnesses at the evidentiary hearing the "young ladies" across the street from his shop, Michael Jones, "Portia," and Louis Driver. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

We further note that the testimony elicited from the witnesses that the petitioner called at the hearing failed to support his claim that counsel was deficient for failing to call them as trial witnesses or that the omission of their testimony prejudiced the outcome of his case. Maria Stewart Price testified at the hearing that she had briefly worked for the petitioner but that she did not know Ricks. Thus, her testimony would have added nothing to his defense. As for Tony Samuels, the testimony he offered at the evidentiary hearing was, according to counsel, nothing like the story he told counsel before trial. Counsel cannot, therefore, be found deficient in his performance for failing to call him as a witness at trial. Finally, neither Dean Holloway nor Jon Pavletic offered testimony that would have been particularly helpful to the petitioner at trial. We fail to see how Holloway's testimony about the petitioner's bloody t-shirt and bruised face would have had any bearing on the case, and his testimony about the victim's heavily tinted vehicle windows, given the multiple eyewitnesses to the shooting and Ricks's cross-examination testimony that the victim's windows were not so heavily tinted that he could not see through them, would have been, at the very best, only minimally helpful to the defense. We also fail to see how the testimony of Pavletic would have added much to the defense.

The petitioner additionally argues that trial counsel was ineffective for failing to investigate or introduce telephone records, which would have proved that he and the victim were in communication prior to the order of protection hearing, and the victim's gun possession arrest in Missouri, by which counsel could have impeached her credibility. We respectfully disagree. As the State points out, the victim admitted on cross-examination that she and the petitioner had had contact during the time in which a previous order of protection had been in effect and that they had talked by telephone during the week leading up to the hearing. Thus, the petitioner has not shown that trial counsel was deficient for failing to introduce the telephone records or that he was prejudiced as a result.

We further agree with the State that it is unlikely that trial counsel would have been allowed to inquire into the victim's 1995 gun possession arrest at trial and that the victim's explanation of the incident, assuming counsel was able to question her about it, would have

-14-

been more damaging to the petitioner's case than to her own credibility. See Tenn. R. Evid. 608(b) ("Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime . . . , may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness, . . . be inquired into on cross-examination . . . ."). The petitioner is not, therefore, entitled to post-conviction relief on the basis of these claims.

## C. Failure to Adequately Represent Petitioner at Sentencing

The petitioner next argues that trial counsel provided ineffective assistance by his failure to adequately represent him at the sentencing hearing. Specifically, he asserts that counsel should have informed him that he had the option of being sentenced under either the old or the new sentencing law, should have objected to the trial court's enhancement of his sentence with a conviction that was still pending appeal and a misdemeanor conviction that was dismissed, and should have presented evidence in mitigation.

We conclude that the petitioner has not met his burden of showing either deficiency of performance or resulting prejudice on the basis of this claim. As noted by the post-conviction court in its order, when senior trial counsel attempted to speak with the petitioner, the petitioner "told [counsel] that his lawyer told him not to discuss sentencing or appeal with [counsel]." Senior trial counsel's testimony about the petitioner's hostile and uncooperative attitude toward him at sentencing was consistent with junior trial counsel's description of the petitioner as a difficult and untrusting client. Further support for junior trial counsel's characterization of the petitioner as a difficult, hard-to-please client is demonstrated by the petitioner's own acknowledgment of the dissatisfaction he felt with his series of post-conviction counsel, the judge who presided over the trial and post-conviction hearing, and the prosecutor in the case.

## D. Failure to Raise Meritorious Issues on Appeal

Lastly, the petitioner argues that counsel provided ineffective assistance by not raising meritorious issues on appeal. The first issue that he asserts counsel should have raised on appeal was his pretrial transfer of custody to the Department of Correction. Counsel, however, testified that he examined the statute authorizing the transfer and saw no real problem with the order. In addition, we addressed the issue of the pretrial transfer of custody earlier in this opinion and concluded that it was proper. The petitioner has not, therefore, shown that counsel was deficient for failing to raise this issue on appeal or that he was prejudiced by counsel's failure to do so.

The next issue the petitioner asserts that counsel should have raised on appeal was the trial court's ruling with respect to proposed testimony by defense witness Kenneth Stowe. The trial record reflects that the victim testified on cross-examination that she had never said that she did not believe that the petitioner had been trying to kill her. When trial counsel later attempted to ask Kenneth Stowe whether the victim had ever made such a statement to him, the State objected and the trial court sustained the objection, ruling that what the victim thought about the petitioner's intent was irrelevant. The trial court did, however, allow trial counsel to present Stowe's testimony in a jury-out proffer of proof.

The petitioner contends that had the issue been "presented on direct appeal, the appellate court should have found the trial court's ruling to be in error" and that "since [the victim's] credibility regarding whether the [petitioner] acted with premeditation was material to this case, it is likely that the admission of [the victim's] prior inconsistent statement would have affected the jury's verdict." We, however, agree with the State that the victim's prior inconsistent statement about her belief as to the petitioner's intent was irrelevant to the issue of whether the petitioner premeditated the shooting and, thus, was properly excluded by the trial court. The petitioner has not, therefore, met his burden of showing that counsel was deficient for not raising this issue on appeal or that the outcome would have been different had counsel done so.

The last issue that the petitioner contends counsel should have raised on appeal was the trial court's selection of the alternate juror. The trial record reflects that counsel objected to the "so-called random, selection of the alternate juror," stating that in counsel's opinion, "that just happens to be the best juror we had." The trial court responded that counsel had seen the court "shuffle the cards [and] pick one at random out." Counsel replied that he "personally did not see anybody shuffle any cards," but he then acknowledged that he "may not have been looking at" the court at the time. At the evidentiary hearing, counsel testified that he was unable to see over the counter at the time the court selected the alternate juror. He said that although he objected at trial, he did not raise the issue on appeal because he did not think it had any merit. In our view, counsel's assessment was correct. We conclude, therefore, that the petitioner, once again, has not shown that counsel was deficient for not raising this issue on appeal or that he was prejudiced by counsel's failure to do so.

## IV. Denial of Petitioner's Motion for Continuance

As his final issue, the petitioner contends that the post-conviction court erred by denying his motion for a continuance because "the record demonstrates he was prejudiced by the inability to present the testimony of [Marshall] Ricks and [Thomas] Cherry." According to post-conviction counsel, "[b]oth witnesses were subpoenaed." Ricks, however, could not be located, and Cherry was unable to appear because he was out of state receiving medical

treatment.

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

The petitioner cannot show that his not having the witnesses denied him his right to a fair trial or that he would have obtained a different result had they testified at the hearing. According to the petitioner, "if Mr. Ricks were called to the stand, he could verify that . . . the events on April 13, 2004 were different than as he previously testified." The petitioner, however, failed to offer any other evidence, such as an affidavit from Ricks, to support his claim that Ricks would have provided testimony about the shooting at the evidentiary hearing that would have been different from the testimony he offered at trial. Even assuming, *arguendo*, that Ricks would have testified at the evidentiary hearing in accordance with the petitioner's version of the events, the petitioner has not shown that the testimony Ricks offered at trial was due to any deficiency in counsel's performance, such as counsel's failure to adequately investigate or his use of poor cross-examination techniques. The trial transcript, which was made an exhibit at the evidentiary hearing, reveals that counsel cross-examined Ricks at some length about his version of the events, inquiring, for example, whether Ricks or the petitioner was driving, when Ricks first saw the gun, whether Ricks could see through the victim's tinted windows, and whether Ricks had any knowledge of the victim's having had a gun. In essence, the testimony that the petitioner claims that Ricks would have offered at the evidentiary hearing would have amounted to a recantation of Ricks's trial testimony, which is more properly addressed in a petition for writ of error coram nobis.

As for Mr. Cherry, the petitioner claimed that he would have been able to testify "that he observed the [petitioner] after he was assaulted at the jail, and that he observed [the petitioner's] physical condition" at the trial. We fail to see the relevance of Mr. Cherry's observation of the petitioner's condition following his assault at the jail, and any testimony he might have offered about the petitioner's physical condition at trial, even if favorable to the petitioner, would have carried very little weight in light of the neurologist's testimony that the petitioner was competent to stand trial. We, therefore, find no abuse of discretion in the post-conviction court's denial of the petitioner's request for a continuance.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE