# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 20, 2014

## STATE OF TENNESSEE v. ERIC PARKER

**Appeal from the Circuit Court for Sullivan County**
**No. S60023      Robert H. Montgomery, Jr., Judge**

_____

**No. E2013-02339-CCA-R3-CD - Filed October 29, 2014**

_____

The defendant, Eric Parker, was convicted after a jury trial of aggravated domestic assault by reckless conduct, a Class D felony, and he was sentenced by the trial court to four years' imprisonment. On appeal, the defendant asserts that: (1) the evidence was insufficient to support the verdict; (2) the proof at trial constituted a variance from or constructive amendment to the indictment; (3) the trial court erred in denying his motions related to a continuance to allow for expert testimony; (4) the trial court erred in not giving a corrective instruction regarding improper prosecutorial argument; (5) the trial court erred in admitting certain evidence at sentencing; and (6) the trial court misapplied enhancement and mitigating factors and improperly refused alternative sentencing. After a thorough review of the record, we discern no error and affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., and DAVID A. PATTERSON, SP.J., joined.

Stephen M. Wallace, District Public Defender; and Steven D. Bagby, Assistant District Public Defender, Blountsville, for the appellant, Eric Parker.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Barry P. Staubus, District Attorney General; and Kaylin Render, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant was indicted for the intentional or knowing aggravated assault of a domestic abuse victim after he beat his girlfriend with a metal rod. The indictment charged that the defendant "did unlawfully, intentionally, knowingly and feloniously and by the use or display of a deadly weapon, to wit: a weight bar, cause bodily injury to another, [the victim], a domestic abuse victim, contrary to T.C.A. § 39-13-102."

The police took photographs of the alleged weapon at the time of the defendant's arrest on July 7, 2011. The defense filed a motion on July 27, 2012, less than two weeks before the scheduled trial, requesting the production of the photographs, the victim's medical records, and the names of all medical personnel who had treated the victim for her injuries. On July 31, 2012, the State responded that it did not possess or intend to introduce the victim's medical records; that it had produced all photographs within its possession; that a photograph of the weapon had been stored on a police officer's PDA and was subsequently lost; and that the weapon itself, however, was in the evidence room available for inspection.

The jury trial took place on August 7, 2012. Prior to trial, the defense moved for a continuance. Defense counsel argued that he had only learned the Wednesday before trial that the photographs had disappeared and that he had tried to see the weapon itself but had only obtained access to the weapon on the day of trial and to a photograph of it the day before trial. Because the weapon did not look the way that he expected, he believed that he needed to procure an expert to testify regarding whether it was consistent with the victim's wounds. He also asserted that he wanted to test the weapon for fingerprints. The trial court denied the motion, finding that "the allegations are not such that this is one that an expert needs to examine and compare the injuries. I think it's such that a lay person can look and make a determination." The trial court further noted that the State was not proceeding on a theory that the victim suffered serious bodily injury. The trial court likewise found that the defendant had delayed subpoenaing the victim's medical records and that, in any case, expert testimony was not necessary to establish whether the victim suffered bodily injury.

At trial, the victim testified that, at the time of the July 7, 2011 assault, she had been dating the defendant, whom she called "Rick," for almost one year and had been living with him on and off. The victim had bought the defendant a set of weights, which were not assembled but sitting in a corner of the living room. This set included two rods. The defendant and victim were in the process of moving to a new apartment, and the defendant had sent the victim to get some money orders earlier in the day. The victim testified that the

defendant was upset because she was unable to use his debit card to get both money orders unless he was present. After the defendant obtained the second money order, he gave both of them, totaling $750, to the victim. The victim put them in the cargo pocket of her pants. At the apartment, she discovered dirt on her pants and spot cleaned them, changing into shorts and hanging the pants on an outside railing to dry.

About fifteen to twenty minutes later, the defendant entered the apartment and asked for the money orders. The victim testified that the way the defendant asked for them made her nervous. She felt in her pockets and thought she had lost them. She then went to the bedroom to look for them but could not think clearly because the defendant was yelling at her to find the money. The defendant then hit her with the back of his hand, and she fell on the floor. The defendant demanded her clothes, and she threw her shorts and shirt at his feet so he could check them. The victim testified that she began to get off the ground and "when I looked up there was a metal rod coming towards me." The defendant beat her with the rod, holding it like a baseball bat, and he continued to demand the money, telling her he would kill her and saying, "You're gonna die today." She testified that he hit her lower back and told her she would never walk again. The victim curled into a fetal position and the defendant hit her repeatedly. She tried to stop the blows with her hand and received an injury to her hand. At trial, the victim identified the metal bar with which she was beaten.

The victim testified that the defendant stopped beating her and she heard the door close. She put on a shirt and some boxer briefs over her underclothing and ran outside, screaming for help. At this point, she was bleeding and her limbs were beginning to swell. She ran up an outside staircase, and a neighbor named Ron tried to stop the bleeding. She testified that she then saw the defendant arrive in a car with a man she knew as "Chief." Ron was still outside, so the victim went into the apartment to gather some possessions. The defendant came in and tried to shut the door, but Chief put his arm and foot against the door and told the defendant not to hurt her anymore. She got her suitcase, and Chief and his wife gave her a ride to her father's house. After observing her injuries, her father called her sister, who took her to the hospital about fifteen minutes later. She found the money orders a week later in the back pocket of her shorts.

The victim testified that she had sustained permanent injuries in the attack, including scars, an injury to a tendon or ligament in her arm, and a hole in her thigh that was so deep that she could see bone at the time of the injury and that medical personnel were unable to close. Photographs of the injuries were introduced into evidence.

Ronnie Hamby, who lived on the floor above the defendant, confirmed that when the victim came upstairs, her arms were swelling and her legs and arm were bleeding. He testified that the victim was trying to get Chief and his wife to help her, but they were not

-3-

doing anything, so he tried to wipe the blood off with a washcloth. He heard no screaming or yelling before seeing the victim, but his apartment was not located above the defendant's.

The victim's father testified that she arrived at his house with obvious injuries, missing a tooth, with marks on her limbs and a wound through which he could see bone. He immediately called the victim's sister, who took her to the hospital about half an hour later, around 2:00 or 3:00 p.m. He testified he had not been to the defendant's home that day and that he had only been to the defendant's apartment once and had not borrowed his money.[1] The defendant's sister, Tonya Thomas, also testified that the victim was swollen, bleeding, and crying; she stated that she took the victim to the hospital sometime after 4:00 p.m.

Officer Nathan Russell participated in the search of the defendant's residence. He testified that the police arrived at the defendant's apartment at around 10:30 or 11:00 p.m. While conducting a protective sweep of the house, he recovered "a barbell," which the victim had previously identified as the weight bar used to beat her, from under the bed in the only bedroom. There was another weight bar, which was slightly longer, in the living room. Officer Brandon Ferrell, a witness for the defense, confirmed that a weight bar was recovered from the defendant's home. He testified that he went to the hospital at about 8:15 p.m., photographed the victim's injuries, and then participated in the arrest of the defendant and search of his home. He took pictures of both the bar Officer Russell recovered from the bedroom and the one from the living room. The victim identified the bar from the bedroom as the one used to beat her, and it was taken into evidence. The photographs were lost from his cell phone when the police department gave him a new PDA.

The defendant chose to testify at trial. The salient points of his testimony confirmed the victim's account of what happened. The defendant testified that after they obtained the money orders, he gave both to her to keep. When he asked the victim to return the money orders, she did not do so, and they began to argue. On direct examination, he merely testified that he never hit her with a weight bar. On cross-examination, however, the defendant clarified that he had hit her repeatedly with a copper broomstick. The defendant testified that he never asked the victim to remove her clothes but that she did so voluntarily so that he could check them for the missing money orders. The defendant agreed that he first hit the victim with his hand and stated that she fell on the bed. He then described how he began to hit her with a broomstick after hitting her with his hand: "When I hit her, she like kicked me

---

[1] The record includes a handwritten statement by the defendant describing how he was not interviewed for the presentencing report due to miscommunications regarding his place of incarceration. The defendant's statement describes how the victim's father had been to the apartment to borrow money earlier in the day. The defendant did not testify to these facts at trial.

back and I went into the wall and then when I came back from the wall that's when I had a broomstick in my hand . . . ." He described the victim's attempt to go to the other side of the bed after he hit her and testified, "so I went around with the broomstick trying to hit her to tell her to give me my money orders and . . . the broomstick was long so I took the broomstick and I bent it over my leg in half." He also testified that he began to hit her with the broomstick because she did not seem adequately frightened. The defendant described the broomstick as a hollow metal rod made of copper. He denied that the victim was screaming, on the floor, or in a fetal position, but he demonstrated how she had her hands around her head. He also denied telling her that he would kill her. He agreed he hit her repeatedly with a metal rod but testified he would not call it a "beating." He agreed with the prosecutor's statement that "basically the only thing you dispute is the fact that a weight bar was used. Everything up to this point you admit doing, it just happened to be with a broomstick is what your testimony is."

The defendant testified that the victim put on some high-heeled shoes and went upstairs to Ron Hamby, Chief,[2] and Chief's wife. He stated that he never left the premises after hitting the victim. He described the victim as having blood trickling down her arm and leg and described Mr. Hamby's attempts to clean the blood. He also corroborated the fact that the victim went back in the apartment, that he tried to close the door, and that Chief put his foot in the door and asked if he could take the victim somewhere. Chief took the victim away in his car.

During closing argument, the State noted for the jury that "[t]he element of the crime is whether or not it was a deadly weapon" and argued that the jury did not have to find that it was a weight bar rather than a copper broomstick. In reviewing the elements of the crime, the prosecutor stated, "Now, I also have to show bodily injury. I don't have to show serious bodily injury." Defense counsel, during closing argument, pointed out that the indictment alleged the use or display of a weight bar. Counsel then argued that the State had not shown that the weapon was a deadly weapon. In doing so, defense counsel read the definition of serious bodily injury and told the jury that it must decide which weapon was used and whether the weight bar or broomstick was used in a manner consistent with causing death or serious bodily injury. In rebuttal, the State once again urged the jury that it only needed to find that the weapon was deadly and not that it was the weight bar in particular. The State then responded to the defense's argument regarding whether the weapon was deadly by arguing that the proof had demonstrated serious bodily injury as well as bodily injury, noting that the victim suffered extreme pain, that she had marks and dents on her body, and that the assault involved obvious disfigurement in the form of scars.

---

[2] The defendant clarified that the man who went by the name "Chief" was actually also named Ron.

The jury convicted the defendant of the lesser included offense of reckless aggravated assault. At the sentencing hearing, the prosecution sought to introduce an audio tape of a jailhouse phone call made by the defendant, who was imprisoned in Washington County on an unrelated attempted first degree murder charge for a crime committed while he was on bond and awaiting trial in the instant case. The defendant objected to the recording based on relevance, hearsay, and the fact that he believed any attempt to explain the recording would prejudice his defense in Washington County. The trial court found the recording relevant to the defendant's criminal behavior and criminal history and concluded that it was admissible hearsay. The recording was admitted after the victim in this case identified the defendant's voice. In the recording, a woman reads a newspaper account of the brutal assault on the victim in the Washington County case, and the defendant admits having shot her multiple times.

The trial court concluded that the defendant's sentence should be enhanced based on his history of criminal behavior and his failure to comply with a condition of a sentence involving release into the community. While the court concluded that the defendant's lack of a prior criminal record was a mitigating factor, it granted this factor little weight and sentenced the defendant to four years' incarceration, the maximum in the range. The trial court denied probation or alternative sentencing.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence, asserting that the State failed to show that the defendant accomplished the assault with the use or display of a deadly weapon. Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. When a court evaluates the sufficiency of the evidence, it must determine whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). This court will not reweigh or reevaluate the evidence, nor may it substitute its inferences drawn from circumstantial evidence for those of the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that can be drawn from it. *Goodwin*, 143 S.W.3d at 775. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant bears the burden of showing that

the evidence is insufficient to support the verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The defendant was convicted of reckless aggravated domestic assault, which, as narrowed by the indictment, is committed when the perpetrator recklessly causes bodily injury to another and the assault involves the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(B)(iii) (2010). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(5). Serious bodily injury, in turn, includes bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. T.C.A. § 39-11-106(34).

The defendant here claims that the assault was committed with a copper broomstick and that a broomstick cannot qualify as a deadly weapon. In *Morgan v. State*, the Tennessee Supreme Court classified weapons which may be considered deadly into two categories: weapons which are deadly *per se*, such as firearms, and weapons which are deadly "by reason of the manner in which they are used." *Morgan v. State*, 415 S.W.2d 879, 882 (Tenn. 1967) (concluding that a hard object wrapped in a sock and used as a bludgeon or club was a deadly weapon). In *State v. McGouey*, the court clarified that "[i]f an item is not a deadly weapon per se, it will only be considered a deadly weapon under subsection B *if the defendant in a particular case actually used or intended to use* the item to cause death or serious bodily injury." *State v. McGouey*, 229 S.W.3d 668, 673 (Tenn. 2007) (concluding that an unloaded pellet gun was not used by the defendant as a deadly weapon) (emphasis in original). Tennessee courts have concluded that many objects which are not inherently dangerous nevertheless satisfy the definition of deadly weapon. *See State v. Downey*, 259 S.W.3d 723, 738 (Tenn. 2008) (flashlight used to hit victim on the head, resulting in a month-long hospital stay was a deadly weapon); *State v. Madden*, 99 S.W.3d 127, 137 (Tenn. Crim. App. 2002) (pointed-toe cowboy boots were a deadly weapon); *State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997) (plastic pen used in stabbing to inflict a puncture wound was a deadly weapon); *see also State v. Alvin Phillips*, No. M2009-02320-CCA-R3-CD, 2011 WL 2174909, at *3 (Tenn. Crim. App. May 31, 2011) (metal folding chair used to hit victim in the face, coupled with death threats, constituted deadly weapon), *perm. app. denied* (Tenn. Sept. 21, 2011); *State v. Anthony D. Forster*, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *10 (Tenn. Crim. App. Apr. 12, 2011) (heavy cordless phone which defendant used to hit victim in the face, leaving a scar, was a deadly weapon), *perm. app. denied* (Tenn. Aug. 24, 2011); *State v. Billy Ratcliffe*, No. 01-C-019103CC00068, 1992 WL 57589, at *2 (Tenn. Crim. App. Mar. 26, 1992) (a "rat tail" hairbrush with a sharp end was a deadly weapon), *perm. app. denied* (Tenn. Aug. 31, 1992).

The witnesses, including the defendant, testified that the defendant became angry at the victim over some money orders, that he hit her with the back of his hand so that she fell, and that he then picked up a metal rod and began to beat her with it. The proof, seen in the light most favorable to the State, also established that the defendant told the victim that she would die and would not walk again as he beat her, that the victim suffered swelling and bruising all over her body, and that the metal rod gouged a hole in her thigh through which bone could be seen. The victim testified that the object used to beat her was a weight bar which the defendant was wielding as one would hold a baseball bat, and a weight bar was recovered from the bedroom where the assault took place. The victim identified several scars that she had as a result of the beating and testified that she had a permanent injury to a tendon or ligament.

The defendant attempts to argue that, unlike a weight bar, which he apparently concedes is a deadly weapon, a hollow copper broomstick cannot be considered a deadly weapon. First, this argument fails because in evaluating the sufficiency of the evidence, we view the proof in the light most favorable to the State; accordingly, the proof summarized above that the weapon was in fact a weight bar would be sufficient to support the conviction even if the difference in the objects were material to the element requiring the use or display of a deadly weapon. Second, we note that serious bodily injury includes protracted or obvious disfigurement and that this court has consistently held that a scar is sufficient to establish serious bodily injury. *State v. Deonte Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at \*4 (Tenn. Crim. App. Oct. 31, 2012) (citing cases for the proposition that a permanent scar is sufficient to support a finding of "protracted or obvious disfigurement"). It was not disputed at trial that the victim had scarring on her body. Accordingly, the object with which the defendant beat the victim and which caused the scarring was clearly one that "in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(5). We conclude that the evidence was sufficient to support the verdict.

## II. Indictment

The defendant next asserts that the proof at trial constituted a variance from or constructive amendment to the indictment. This claim is based on the fact that the indictment specified that the weapon used was a weight bar, but the defendant testified that it was in fact a metal broomstick.

A variance occurs when the evidence at trial does not correspond to the elements of the offense as charged in the indictment. *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). In other words, "'not only must the government prove the crime it charges, it must charge the crime it proves.'" *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App.

2001) (quoting 41 Am. Jur. 2d Indictments and Informations § 258 (1995)). Tennessee no longer adheres to a stringent variance rule. *March*, 293 S.W.3d at 588. A variance between the indictment and proof must be material and prejudicial to entitle the defendant to relief. *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). A variance is not fatal if "(1) the defendant is sufficiently informed of the charges levied against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds." *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993).

We begin by noting that the State introduced proof at trial establishing that the victim was beaten with a weight bar. The victim identified the object with which she was beaten as a weight bar, and a weight bar was recovered from the bedroom. Accordingly, the proof introduced by the State at trial did not vary from the allegations in the indictment. The prosecution, however, argued that the jury did not need to find that a weight bar was the instrument used to beat the victim, and the jury instructions only required the jury to find that a deadly weapon was used. The defendant contends that this amounted to a variance or constructive amendment of the indictment.

When the indictment contains surplus language, it may be defective. *March*, 293 S.W.3d at 588. "[H]owever, an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged." *Id.* Surplusage raises an issue of variance when a fact that was gratuitously alleged is not proven at trial. *Id.* at 588-89. Because Tennessee no longer adheres to a strict variance rule, "[g]enerally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence." *Id.* at 589. A constructive amendment of the indictment, which unlike a variance requires automatic reversal, occurs when the jury is permitted to convict the defendant based on facts introduced that modify an essential element of the crime. *Goodson*, 77 S.W.3d at 244.

Here, the language describing the deadly weapon used by the defendant as a weight bar was surplusage: the use of a weight bar is not an element of the crime of aggravated domestic assault. Any variance was not fatal. The jury was correctly instructed, as an element of the offense, that it must find that a deadly weapon was used. The defendant was sufficiently informed of the charges to allow him to prepare a defense for trial, and the indictment and verdict provide him with protection from a subsequent prosecution for the same offense. Accordingly, the defendant is not entitled to relief on this issue.

### III. Continuance

The defendant also claims he is entitled to relief based on the fact that the trial court

denied his motion for a continuance and he was not therefore able to obtain expert testimony to disprove the State's contention that the victim was beaten with a weight bar. The decision to grant or deny a continuance lies within the trial court's discretion. *State v. Schmeiderer*, 319 S.W.3d 607, 617 (Tenn. 2010). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" *Id.* (quoting *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)). The defendant bears the burden of showing that the denial of the continuance resulted in harm. *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008).

While the defendant here asserts that he needed a continuance in order to obtain expert testimony regarding the weapon used and the victim's injuries, he has made no showing that the testimony would have shown any discrepancy between the victim's wounds and the alleged weapon. *See Schmeiderer*, 319 S.W.3d at 617 (concluding that the defendant had failed to show expert testimony would have been favorable); *see also State v. Odom*, 137 S.W.3d 572, 590 (Tenn. 2004) (same). Moreover, even if the expert testimony could have shown that the weapon was not, as the victim testified, a weight bar but rather, as the defendant testified, a metal broomstick, it cannot be reasonably concluded that a different result would have followed. The defendant's issue is premised on the assumption that the broomstick is not a deadly weapon. As we have concluded above, however, the particular weapon used is not dispositive in this case because the evidence showed that the weapon, whatever it was, left scars on the victim and was therefore capable of causing serious injury or death. Accordingly, the defendant is not entitled to relief.

### IV. Instructions Regarding Serious Bodily Injury

The defendant next contends that the trial court erred in refusing to give a corrective instruction after prosecutorial misconduct during closing arguments and that the jury instructions were misleading because the element of serious bodily injury was defined. The crux of this argument is that the defendant believes that the jury might have convicted the defendant of aggravated assault based on serious bodily injury under Tennessee Code Annotated section 39-13-102(a)(1)(A)(i) rather than aggravated assault based on the use or display of a deadly weapon under Tennessee Code Annotated section 39-13-102(a)(1)(A)(iii). The State asserts that the issue is waived for failure to object contemporaneously. Because defense counsel asked the trial court once again to clarify the role of serious bodily injury for the jury immediately after the State's rebuttal argument, we choose to examine the issue.

The trial court has wide discretion in controlling the course of closing arguments, and an appellate court will only reverse for an abuse of that discretion. *State v. Bane*, 57 S.W.3d

411, 425 (Tenn. 2001). Closing arguments must be (1) temperate; (2) predicated on evidence adduced at trial; and (3) pertinent to the issues. *State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). The prosecution, which is taxed with seeking justice rather than mere advocacy, is more limited in its prerogatives than other parties and must refrain from arguments tending to inflame the jury. *Id.* However, even if prosecutorial misconduct is shown, the error will result in reversal only if it has affected the outcome of the case to the prejudice of the defendant. *Bane*, 57 S.W.3d at 425.

Here, the defendant objects to the prosecutor's argument that the victim actually suffered serious bodily injury based on the pain she suffered and the scarring to which she testified. The defense believes that this argument misled the jury to convicting the defendant of aggravated assault based on serious bodily injury rather than the use or display of a deadly weapon as charged. However, a review of the transcript reveals that the prosecution meticulously catalogued the elements of the offense, pointing out to the jury that it only needed to show bodily injury rather than serious bodily injury and telling the jury that it must find the use or display of a deadly weapon. During its closing argument, the defense read the definition of serious bodily injury, urging the jury to find that a deadly weapon had not been used. In response, the State argued that a deadly weapon was one capable of causing serious bodily injury and submitted that this element had been met because it was not disputed that the victim suffered scarring and pain as a result of the crime. The argument was temperate, predicated on evidence adduced at trial, and pertinent to the issues. Accordingly, there was no misconduct. Moreover, as we discuss below, the actual jury instructions were such that the jury could not have been misled regarding the element that raised the crime to aggravated assault rather than assault.

Insofar as the defendant challenges the jury instructions as part of this issue, we discern no error in the instructions. A defendant has a right to a complete and correct charge of the law, including a description and definition of each element of each offense. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *Faulkner*, 154 S.W.3d at 58. Here, the jury instructions included both aggravated domestic assault by intentional or knowing conduct and aggravated domestic assault by reckless conduct. The instructions for both of these offenses stated that the jury must find that the defendant caused bodily injury to the victim, who was a domestic abuse victim, and that he used or displayed a deadly weapon. The instructions provided the mens rea for each offense. The trial court defined bodily injury for the jury. The definition of deadly weapon, making reference to serious bodily injury, was also included, and serious bodily injury was in turn defined. The defendant's alleged error, premised on the unlikely proposition that the jury intuited, independently of any instructions, that serious bodily injury

is an alternative way to raise assault to aggravated assault and that the jury then disregarded the trial court's instructions and convicted on this basis, is without merit. As there was no error in the instructions and no misconduct on the part of the prosecution, the defendant is entitled to no relief.

## V. Evidence at the Sentencing Hearing

The defendant next challenges, on the basis of hearsay, the trial court's decision at the sentencing hearing to admit the recording of the defendant admitting to other crimes, which the trial court found was relevant to his criminal behavior. The defendant asserts that the statements are not admissible under Tennessee Rule of Evidence 803(1.2) because the content is an admission of a crime other than the one for which he was being sentenced. He also objects that the statement cannot be cross-examined and that the defendant cannot attack it without giving up his Fifth Amendment rights.

Under Rule 803(1.2), an exception from the rule against hearsay is "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity." Tenn. R. Evid. 803(1.2). This Rule covers "'[a]nything the opposing party said or wrote out of court[.]'" *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007) (quoting Donald F. Paine, *Paine on Procedure: Admissions 'against interest,'* 43 Tenn. B.J. 32 (April 2007)). The language of the Rule does not limit the statements to ones made against interest nor are they limited to ones in relation to the offense at issue, although the evidence must of course satisfy the rules of relevance and other rules of evidence. *See* Tenn. R. Evid. 803(1.2); T.C.A. § 40-35-209(b) (generally applying rules of evidence to sentencing). Contrary to his claims, the defendant is a party to the sentencing proceedings. *See Lewis*, 235 S.W.3d at 145; *City of Chattanooga v. Swift*, 442 S.W.2d 257, 258 (1969) (holding that a party is "one having a right to control proceedings, to make a defense, to adduce and cross-examine witnesses, and to appeal from the judgment"); T.C.A. § 40-35-209(b) (allowing the defendant to call and cross-examine witnesses and present evidence at sentencing); Tenn. R. App. P. 3(b) (allowing the defendant to appeal his sentence when no plea agreement was in place). Accordingly, the recording was properly admitted as the statement of a party. Moreover, Tennessee Code Annotated section 40-35-209(b) provides that even though the Rules of Evidence apply to a sentencing hearing, "reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted."

As to the defendant's objection to the fact that the declarant of a hearsay statement cannot be cross-examined, this is, of course, the nature of hearsay and the reason that it is generally not admissible under the Rules. The statement was properly admitted, and there

was no error.

## VI. Sentencing

The defendant next objects to the length of his sentence and the denial of alternative sentencing. The defendant does not assert that he was sentenced outside the appropriate range; instead, he challenges the trial court's application of enhancing and mitigating factors. A sentence which falls in the appropriate statutory range is reviewed for an abuse of discretion, with a presumption of reasonableness granted to within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. As long as other reasons consistent with the purposes and principles of sentencing support a within-range sentence, the trial court's ruling will be upheld on appeal. *Id.*

Here, the trial court sentenced the defendant to four years, the maximum within the appropriate range. The defendant objects that the trial court improperly applied enhancement factors: (8) that the defendant failed to comply with the conditions of a sentence involving release into the community; and (12) that the defendant intentionally inflicted serious bodily injury upon another person. *See* T.C.A. § 40-35-114. He does not challenge the application of enhancement factor (1) finding that the defendant possessed a previous history of criminal behavior in addition to that necessary to establish the range. *See id.* He also asserts error in the trial court's refusal to find mitigating factors: (1) that the defendant's conduct neither caused nor threatened serious bodily injury, and (11) that the defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. T.C.A. § 40-35-113. The trial court found that the defendant admitted to shooting another woman while he was out on bond and awaiting trial. In rejecting the mitigating factors put forth by the defense, the trial court noted that the proof at trial, including the photographs of the numerous marks left by separate strikes with the metal rod and the victim's testimony regarding scars, supported the conclusion that the defendant had acted intentionally and that the victim suffered serious bodily injury. However, the trial court did not apply enhancement factor (12) regarding the intentional infliction of serious bodily injury upon another person. The trial court noted that it had considered the principles of sentencing, arguments of the attorneys, nature and characteristics of the criminal conduct, the enhancement and mitigating facts, the defendant's handwritten amendment to the presentencing report, and recent sentencing in the state. The trial court noted it gave little weight to the fact that the defendant had no prior convictions.

The State concedes that the trial court incorrectly applied enhancement factor (8)

because the defendant was not serving a sentence. In *Bise*, the trial court misapplied the single enhancement factor in sentencing the defendant above the minimum sentence in the range. *Bise*, 380 S.W.3d at 708. Nevertheless, the sentence was upheld because the trial court articulated sound reasons for imposing the sentence and was entitled to a presumption of reasonableness. *Id.* at 709. We conclude that the trial court's decision to impose a sentence within the appropriate range reflects a proper application of the purposes and principles of sentencing and that the trial court did not abuse its discretion in setting the length of the sentence.

The defendant also objects to the fact that he was denied any sort of alternative sentencing. A defendant who is a standard offender convicted of a Class C, D, or E felony is considered a favorable candidate for alternative sentencing in the absence of evidence to the contrary and if the court determines that the defendant does not need to be given priority for incarceration due to committing the most severe offense, possessing a criminal history evincing a clear disregard for the laws and morals of society, or evincing failure of past efforts at rehabilitation. T.C.A. § 40-35-102(5), (6)(A).

Decisions regarding probation and alternative sentences are reviewed for an abuse of discretion, and within-range sentences reflecting an application of the purposes and principles of sentencing are given a presumption of reasonableness on appeal. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). The defendant bears the burden of establishing suitability for probation and showing that it will serve the best interests of both the public and the defendant. *State v. Sihapanya*, __ S.W.3d __, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *1 (Tenn. April 30, 2014). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *Id.* at *3. In evaluating the appropriateness of incarceration, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C) .

Regarding the nature and circumstances of the crime, the trial court found that the crime was violent and intentional. Based on this conviction and the evidence introduced regarding the subsequent crime, the court found that the defendant was a dangerous offender with a clear disregard for the laws and morals of society, that he did not have potential for rehabilitation, and that confinement was necessary. We conclude that the trial court properly considered the statutory criteria and purposes and principles of sentencing in deciding to impose a sentence to be served. Accordingly, we discern no abuse of discretion.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE